GOULD, INC., Plaintiff-Appellee,

v.

WISCONSIN DEPARTMENT OF INDUSTRY, LABOR AND HUMAN RELATIONS, et al., Defendants-Appellants.

Nos. 84–1115, 84–2075.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 17, 1984.

Decided Dec. 13, 1984.

---

Before CUMMINGS, Chief Judge, WOOD, Circuit Judge, and FAIRCHILD, Senior Circuit Judge.

CUMMINGS, Chief Judge.

Gould, Inc. ("Gould") filed suit in the Western District of Wisconsin challenging the constitutionality of Wis.Stat. §§ 16.-75(8), 101.245 (1981), which blacklist labor law violators. Both parties filed motions for summary judgment. The district court granted Gould's summary judgment motion, holding that the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* (the "NLRA"), preempted the state statutes. In a later hearing, the district court awarded Gould attorneys' fees under 42 U.S.C. § 1988. The individual defendants appeal both decisions of the district court.[1] We affirm the lower court's grant of summary judgment but reverse as to attorneys' fees.

I

No genuine issues of material fact are in controversy. The parties dispute only the district court's legal conclusions set out in the opinion below, *Gould, Inc. v. Wisconsin Department of Industry, Labor and Human Relations*, 576 F.Supp. 1290 (W.D. Wis.1983). Section 101.245 of the Wisconsin Statutes provides:

(1) The [Department of Industry, Labor and Human Relations] shall maintain a list of persons or firms that have been found by the national labor relations board, and by 3 different final decisions of a federal court within a 5-year period * * *, if the final decisions involved a cumulative finding of at least 3 separate violations, to have violated the national labor relations act, * * * and of persons or firms that have been found to be in contempt of court for failure to correct a violation of the national labor relations act on 3 or more occasions by a court within a 5-year period * * * if the 3

Columbus R. Gangemi, Jr., Winston & Strawn, Chicago, Ill., for plaintiff-appellee.

Charles D. Hoornstra, Asst. Atty. Gen., Wis. Dept. of Justice, Madison, Wis., for defendants-appellants.

---

1. Gould filed suit against three Wisconsin state agencies and seven individual Wisconsin state officers and employees. The district court dismissed the three defendant state agencies as immune from action under the Eleventh Amendment. That ruling is not at issue.

contempt findings involved a cumulative total of at least 3 different violations.

\* \* \* \* \* \*

(4) A name shall remain on the list for 3 years.[2]

Wis.Stat. § 101.245 (1981).

This list is known as the labor law violators' list. The real bite in the legislation appears in Section 16.75(8), which provides:

The department [of administration] shall not purchase any product known to be manufactured or sold by any person or firm included on the list of labor law violators compiled by the department of industry, labor and human relations under s. 101.245.

Wis.Stat. § 16.75(8) (1981).

Gould is a Delaware corporation with its principal place of business in Illinois. In August 1982, two of its divisions had contracts to provide goods and services to Wisconsin in amounts in excess of $10,000 and expected to continue to bid on and be awarded contracts to provide goods and services exceeding $10,000. Wisconsin's Department of Industry, Labor and Human Relations placed Gould on the labor law violators' list in August 1982, thus under Section 101.245(4) barring Wisconsin from doing business with Gould for three years, until July 1, 1985. Defendant John Driscoll, on behalf of the Wisconsin Department of Administration, advised Gould that its existing contracts would be cancelled as soon as that could be done without penalty. The predicate for these actions was the enforcement of three separate National Labor Relations Board ("NLRB") decisions against various Gould divisions during the preceding five years. Gould no longer owned any of these divisions at the time of being placed on the labor law violators' list, and none of the cited divisions were located in Wisconsin. Gould claims that the two Wisconsin statutes violate the Supremacy Clause, Art. VI, of the Constitution, as well as the due process and equal protection clauses of the Fourteenth Amendment. The district court did not address the Fourteenth Amendment claims due to its disposition of the case on grounds of preemption. The court did, however, hold that Gould's Fourteenth Amendment claims were "sufficiently substantial to support federal jurisdiction and would justify an award of attorneys' fees, even though plaintiff prevailed on another claim [preemption]," citing *Maher v. Gagne*, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653. (Order of May 25, 1984.) We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II

The difficulty in labor law preemption analysis is that "the aims and social policy" Congress was implementing "were drawn with broad strokes while the details had to be filled in, to no small extent, by the judicial process." *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 240, 79 S.Ct. 773, 777, 3 L.Ed.2d 775. Nonetheless, synthesis of the numerous decisions is possible. *Garmon* directs us to determine whether the activity the state would regulate is protected or prohibited by Sections 7 or 8 of the NLRA, or arguably so protected or prohibited. *Id.* at 244–245, 79 S.Ct. at 779–780. When Section 7 or 8 clearly covers the conduct in question, then the NLRA preempts any state action, because to "leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law." *Id.* at 244, 79 S.Ct. at 779.

---

**2.** This Section also provides:

(5) If any person or firm files a written statement with the department alleging that the person's or firm's name should not be included on this list because the person or firm did not violate that national labor relations act as provided in sub. (1) or that 3 years have passed since the person's or firm's name was included on the list, the department shall hold a hearing on the matter. If the department finds that the allegations in the person's or firm's statement are correct, the department shall notify the department of administration that it should remove the person's or firm's name from the list.

Exceptions to this general rule do exist. Courts must make "a balanced inquiry into such factors as the nature of the federal and state interests in regulation and the potential for interference with federal regulation." *Farmer v. United Brotherhood of Carpenters & Joiners of America, Local 25,* 430 U.S. 290, 300, 97 S.Ct. 1056, 1063, 51 L.Ed.2d 338. State interests that are "a merely peripheral concern" of federal labor law override the federal interest. *Garmon,* 359 U.S. at 243, 79 S.Ct. at 778. Alternatively, state regulation may escape preemption by being directed at state "interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." *Id.* at 244, 79 S.Ct. at 779. Examples of this type of permissible state regulation include permitting suits in state court for intentional infliction of emotional distress, *Farmer, supra;* for malicious libel, *Linn v. United Plant Guard Workers,* 383 U.S. 53, 86 S.Ct. and for mass picketing and threats of violence, *Automobile Workers v. Russell,* 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030.[3]

■ The defendants would circumvent this analysis by arguing that, because the Wisconsin legislation seeks to promote compliance with the NLRA and does not penalize conduct that the NLRA would protect, federal interests are not harmed. The defendants also contend that Wisconsin has a deeply rooted interest in compliance with the labor laws, so that its decision not to purchase goods and services from labor law violators should prevail over any possible impingement on the federal regulatory structure. We recognize that Wisconsin's decision to refuse all financial support and reward to those who repeatedly violate national laws reflects a laudable purpose of substantial importance to the people of Wisconsin. But we must balance Wisconsin's interest against the federal interests at stake and the statute's potential for interference with the federal regulatory scheme. Doing so demonstrates that the Wisconsin statutes are preempted.

■ The problem with the defendants' argument is that it ignores that the NLRA is designed to be a remedial, not a punitive statute. Once an employer or union rectifies its unlawful conduct and makes those harmed whole, for example by reinstating a wrongfully-discharged employee with back pay, federal sanctions cease. Basing a boycott on federal labor law violations, regardless of where the violations occurred and whether they have been rectified, clearly interferes with the federal scheme.[4]

3. Some activity is neither protected nor prohibited by the NLRA, nor even arguably so. In such cases the court must determine whether Congress intended to leave the activity at issue to the free play of economic forces, or whether states may regulate it. See *Lodge 76, Int'l Ass'n of Machinists v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396; *Local 20, Teamsters, Chauffeurs and Helpers Union v. Morton,* 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280. Once again, a balancing process similar to that described above is required. See *New York Tel. Co. v. New York State Dep't of Labor,* 440 U.S. 519, 527–528, 530–533, 99 S.Ct. 1328, 1334–1335, 1335–1337, 59 L.Ed.2d 553 (plurality opinion).

The Ninth Circuit applied this balancing analysis in this situation in *Golden State Transit Corp. v. City of Los Angeles,* 686 F.2d 758 (9th Cir.1982), certiorari denied, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 954. The court of appeals vacated the district court's grant of a preliminary injunction prohibiting Los Angeles from allowing plaintiff's taxicab franchise to expire. One effect of the city's denial of the taxicab franchise renewal was to alter the balance of power in a collective bargaining dispute in favor of the union. *Id.* at 759. The question before the court was whether Congress had preempted the city's ability to allow the franchise to expire during labor negotiations as a regulation of conduct meant to be left to the free play of economic forces. Because the city's action involved the use of streets and highways, a traditionally local matter, and because Congress had exhibited no intent to interfere with the city's granting franchises to whom it pleased, the city's action was allowed. The effect on the national labor regulatory scheme was slight enough that state regulation was permissible. The instant situation differs in its being directed expressly at violations of the NLRA, and its concomitantly greater impact on national labor law. Gould's attempted reliance on *Golden State* is therefore misplaced.

4. The defendants argue that if the statutes are not preempted, then they are not punitive. Such reasoning inverts the true logic. If the

The problem can be stated in another way. The Wisconsin legislation seeks to prohibit activity also prohibited by the NLRA. *Garmon, supra,* teaches that state regulation of both activity protected and prohibited by the NLRA is preempted. Defendants would limit *Garmon* and its progeny to those situations in which a state is attempting to prohibit activity protected by the NLRA. Nonetheless, the cases will not withstand such factual distinctions. The Court clearly stated in *Garmon* that its rule applied without distinction to a state's attempt to regulate either protected or prohibited activity. The majority emphasized that they necessarily were "concerned with the potential conflict of two law-enforcing authorities, with the disharmonies inherent in two systems, one federal the other state, of inconsistent standards of substantive law and differing remedial schemes." *Garmon,* 359 U.S. at 242, 79 S.Ct. at 778. Indeed the NLRA was enacted to remedy the varying attitudes of the states toward labor law. *Garner v. Teamsters Union,* 346 U.S. 485, 490, 74 S.Ct. 161, 165, 98 L.Ed. 228.[5] The defendants cannot argue that the Wisconsin statutes are saved from any such conflict between remedial schemes by their addressing the problem of recidivism instead of specific instances of labor law violations.[6] While recidivism is conduct that the NLRA has chosen not to prohibit directly, Congress' failure to do so does not necessarily imply that the remedy is thereby left to the states.[7]

The possibility of other states' adopting Wisconsin's general scheme supports our holding of preemption. The spectre of different states' imposing boycotts for various lengths of time, based on various numbers and types of NLRA violations, is sufficiently real to decline to uphold the Wisconsin legislation. Doing otherwise would reintroduce the "diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies," *Garner,* 346 U.S. at 490, 74 S.Ct. at 165, that the NLRA sought to prohibit.

The defendants argue that Wisconsin is acting as a market-participant, not as a

---

statutes impose no penalty, then they most probably are not preempted, and not the other way around. Our objection to the statutes is that they do impose a penalty.

5. *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418, highlights the importance of maintaining the balance Congress has set against possible infringement by the states. In that decision, the Supreme Court, although concluding that the union's activities had been illegal, nevertheless held that those activities could not be subjected to a state's antitrust laws since the state laws could not be assumed to accord with federal labor policies. On the other hand, federal antitrust laws could be assumed to be carefully tailored in order to accommodate national labor policies, so that union activity could be subjected to them. *Id.* at 636–637, 95 S.Ct. at 1841–1842. Thus *Connell* teaches that courts must examine with care state legislation directly affecting either side in a labor law dispute before upholding such statutes.

6. Admittedly, the Wisconsin scheme does not require a court to examine whether specific conduct was violatory of the NLRA. A court need only determine whether the company incurred the requisite number of labor law violations that were enforced by a federal court, regardless of whether the violations have been remedied. This configuration in fact makes the statute appear more, not less, like a penalty. In light of the entire Wisconsin statutory scheme, the statute's concerning itself with recidivism alone is not determinative.

7. In fact Congress has authorized the NLRB to deal with recidivism when the NLRB deems it appropriate. Accordingly, 29 C.F.R. § 101.13(b) (1983) provides that "[d]espite compliance, however, the Board's order is a continuing one; therefore, the closing of a case on compliance is necessarily conditioned upon the continued observance of that order; and in some cases, it is deemed desirable, notwithstanding compliance, to implement the order with an enforcing decree." Doing so alleviates the necessity of obtaining an enforcement decree later when violations occur and so allows the Board to act more quickly should an organization in initial compliance with an order subsequently violate it. Presumably the Board would initiate such action only against companies with bad track records on compliance, for the language of the regulation—allowing NLRB initiation of enforcement proceedings "in some cases"—implies that Congress intended the NLRB to penalize recidivism only in rare instances. Allowing the states indiscriminate punishment of recidivism impermissibly intrudes on the federal scheme of regulation.

market-regulator, so that the foregoing analysis is inapposite. The argument is unpersuasive. The major cases on which they rely—*Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220; *Reeves, Inc. v. Stake*, 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244; *White v. Massachusetts Council of Construction Employers*, 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1,—are not controlling. Each of these cases is a dormant Commerce Clause case, dealing with the range of state regulation activity permissible in areas where Congress has failed to act. They do not address the issue before us, the range of state regulation allowable when Congress has legislated decisively in the area.

The cases defendants cite that do consider NLRA preemption of state action are distinguishable too. *Image Carrier Corp. v. Beame*, 567 F.2d 1197 (2d Cir.1977), certiorari denied, 440 U.S. 979, 99 S.Ct. 1785, 60 L.Ed.2d 239, involved a New York City Resolution "requiring bidders for flat-form work to operate a union plant." *Id.* at 1199. Insofar as it based its identification of those companies from whom it would entertain bids on labor policies, the Resolution parallels the statutes at issue in this case. But the analogue breaks down in that New York City was not imposing any penalty for failure to comply with the NLRA, nor was it requiring that an employee join a union despite Section 7's protection of a person's refusal to join. *Id.* at

1202. As such, New York was assessing no penalty for noncompliance with the NLRA. The issue for the Second Circuit then became whether the NLRA preempted the municipal Resolution because it was adverse to the NLRA rather than because it promoted the NLRA's objectives more vigorously than Congress would sanction. Because the court found no evidence to indicate that the Resolution had "even an indirect coercive effect on nonunion employees" and so in no way "alter[ed] the collective bargaining relationship within nonunion shops, there [was] no need to determine whether Congress intended that federal labor law preempt those local practices which do alter collective bargaining relationships." *Id.*[8] In other words, the Resolution did not regulate employees' conduct. Defendants suggest that the Wisconsin statutes have no coercive effect because they seek to influence conduct, not to regulate it. Nevertheless the breadth of the Wisconsin laws—a company's being prohibited from doing any business at all with the state for a period of three years—necessarily means that their imposition against a company imposes a much harsher sanction than Congress intended. The Wisconsin laws then are more than a policy statement; they actually regulate employers' conduct.[9]

*Amalgamated Transit Union, Div. 819 v. Byrne*, 568 F.2d 1025 (3d Cir.1977) (*en banc*), dealt with New Jersey's statement,

---

**8.** In *J.P. Stevens & Co. v. Jackson*, 85 Lab.Cas. (CCH) ¶ 10,980 (N.D.Ga.1978), the district court relied on *Image Carrier*. The case involved the mayor of Atlanta's decision to bar city contractors from purchasing goods or services from J.P. Stevens or any other company with whom J.P. Stevens was a first-tier contractor "until and unless the J.P. Stevens Company and such of those companies with whom they do contract cease and desist from such *discriminatory* and *illegal* practices." Executive Order 77–10, quoted in *id.* at 19,781 (emphasis in original). Nonetheless, the court did not raise or discuss the labor preemption issue. Its failure to do so renders the opinion inapposite here. To the extent that the district court relied on *Image Carrier*, it did so for its due process analysis, not its preemption analysis.

The court also treated the mayor's decree as imposing only a condition precedent to J.P. Ste-

vens' contracting with the city. Unlike the Wisconsin legislation, Mayor Jackson's Executive Order would cease to operate once J.P. Stevens came into compliance with federal labor law. It was not an unconditional three-year bar to doing business with Atlanta. This difference justified the district court's agreeing with the mayor that "he did not preclude plaintiff from contracting with the city, he merely inserted a reasonable condition precedent to such contracting." *Id.* at 19,782 (footnote omitted). See also *id.* at 19,784 (district court's acceptance of mayor's contention).

**9.** Indeed the Wisconsin legislature enacted the laws because it believed they would do so. The possibility of a three-year boycott by the state of Wisconsin imposes overmuch on the NLRA.

during collective bargaining between privately owned transit companies and labor unions, that the state would not continue to subsidize the operations of any company that agreed to an uncapped cost of living clause in its labor agreement. The Third Circuit stressed that "it is important to consider that New Jersey's interest is that of insuring that 'essential' transportation services are provided to the public, rather than regulating labor relations per se." *Id.* at 1030. This consideration is what distinguishes that case from the one before us. New Jersey's purpose in acting as it did was to conserve its scarce financial resources and ensure that it was purchasing the least expensive goods available on the market. The state was not, as is Wisconsin, attempting to regulate private companies' labor practices. Nor was it forbidding their operation in the state, though admittedly any company that accepted an unlimited cost of living clause would have to forego receiving state subsidies. Wisconsin, on the other hand, does not suggest that its action is necessary to conserve public resources; the state merely wants to condition any contract award on the bidder's track record of compliance with the NLRA. Wisconsin's doing so significantly interferes with the mechanisms the NLRA has established for encouraging compliance so that they preempt the Wisconsin legislation.

*Amalgamated Transit Union* differs from this case in a second respect. New Jersey chose to subsidize private companies only because it believed that doing so benefited the public. The state could have decided at any time that doing so was no longer an efficient use of funds and repealed its legislation authorizing that allocation of money. The situation before us is quite different. Absent a few narrow exceptions,[10] contract bidders in Wisconsin have a right to expect that the company submitting the lowest bid will win the contract. Wis.Stat. § 16.75 (1981). This expectation differs from the hope of a private company that the state will continue to fund its activities. Wisconsin, unlike New Jersey, simply is not functioning as a private purchaser of services. The question is the rationale underlying Wisconsin's law. When the policy the law promotes is not efficient use of state funds but the intent to effect compliance with the NLRA, the regulation is preempted by the NLRA's establishment of a comprehensive regulatory scheme meant to preclude state action.[11]

We rest our holding on the penalty that Wisconsin has imposed on recidivist labor law violators. The Wisconsin legislation does not impermissibly burden Gould's federal appeals rights. What is impermissible is its punishment of recidivism, not its defining the companies affected in terms of number of court enforcements of NLRB orders. The possibility of incurring harsher sanctions because of an appeal is not an unheard of event in our system of law. For instance, the Supreme Court held in

10. Among others, these include the consideration of life cycle costs such as energy efficiency, writing specifications to permit whenever possible the purchase of materials manufactured in the United States, and purchasing patented or proprietary articles. See Wis.Stat. § 16.75 (1981). These exceptions reflect no intent to affect the national labor policy and so are not preempted.

11. That a statute may escape preemption because it is a general law not aiming to regulate conduct subject to Sections 7 or 8 of the NLRA or affect the bargaining relationships between employers and employees underscores the difficulties inherent in the defendants' arguments. See *New York Tel. Co. v. New York Labor Dept.*, 440 U.S. at 529, 533, 99 S.Ct. at 1337 (plurality opinion) (pointing out that no attempt to affect the relationships governed by the NLRA was at stake). The constant reiteration in the caselaw of the reminder in *Garmon* that even laws of general application, as well as "laws directed towards the governance of industrial relations," 359 U.S. at 244, 79 S.Ct. at 779, may be preempted supports a negative inference that laws directed specifically at labor relations, such as the Wisconsin legislation before us, should be regarded with great suspicion. See, *e.g., New York Tel.*, 440 U.S. at 533, 99 S.Ct. at 1337 ("our cases have consistently recognized that a congressional intent to deprive the States of their power to enforce such general laws is more difficult to infer than an intent to preempt laws directed specifically at concerted activity").

*Chaffin v. Stynchcombe*, 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714, that the possibility of a higher sentence on retrial did not chill the petitioner's appeal rights. *In re Sewell*, 690 F.2d 403 (4th Cir.1982), and *Nash v. Florida Industrial Commission*, 389 U.S. 235, 88 S.Ct. 362, 19 L.Ed.2d 438, are not to the contrary. *Nash* involved Florida's denial of unemployment benefits to those who file unfair labor practice charges, and so involved direct state regulation of conduct protected by the NLRA rather than the problem of a state penalizing conduct also penalized by the NLRA. *Sewell* in fact supports our decision. It involved a union's state law claim against a company president for tortious interference with a contractual relationship. The president had refused to recognize the union in order to challenge its certification by the NLRB. The NLRB found the president's conduct violative of the NLRA. Nonetheless, the state court refused to allow the state law claim, remarking that "[s]tate law which is invoked to redress conduct prohibited by § 8 of the Act falls squarely within *Garmon's* doctrine of preemption." *Sewell*, 690 F.2d at 408.[12] The state law was preempted in that case because it imposed a penalty on the employer that was in addition to the one imposed by the NLRA, not because it infringed on the employer's appeal rights. *Sewell* supports our result and reasoning.

That the initiative to appeal is not always in the hands of the private company buttresses the distinction made here. The NLRB may enforce some of its orders "notwithstanding compliance" by the company charged. 29 C.F.R. § 101.13(b).[13] Consequently the NLRB itself may in some instances initiate an enforcement proceeding—even if a private company would seek to avoid such a proceeding by complying with the order at issue.[14] A private party's inability to control in every instance whether an enforcement order will be sought means that the Wisconsin statutes do not measurably affect a party's appeal right. This is especially so since the number of appeals is not really being restricted at all. As long as a party's position has merit, then it most probably will prevail on appeal.[15] The number of violations is irrelevant to the Wisconsin statutory scheme; only the number of enforced orders is considered. But because the Wisconsin legislation does furnish a state remedy at variance with the federal statutory scheme, we hold that the Supremacy Clause preempts the statutes at bar.

### III

Gould argues that the alleged restriction on its appeal rights imposed by the Wisconsin legislation justifies the dis-

---

**12.** Accord *Carter v. Sheet Metal Workers' Int'l Ass'n*, 724 F.2d 1472 (11th Cir.1984).

**13.** See *supra* n. 7.

**14.** The mechanism for doing so is detailed in 29 C.F.R. § 101.14:

"If the respondent does not comply with the Board's order, or the Board deems it desirable to implement the order with a court decree, the Board may petition the appropriate Federal court for enforcement."

**15.** Gould argues that the Wisconsin legislation inhibits an employer's engaging in "gray area" activities out of the fear of incurring an NLRB violation, thereby circumventing the NLRB's determination of which such activities are permissible under the NLRA, and thus affecting the NLRB's ability to determine and develop national labor policy. To support its claim, Gould points to two instances in which it appealed

NLRB orders to determine whether certain novel practices violated the NLRA, *Gould Inc.*, 238 NLRB 618 (1978), enforced, 638 F.2d 159 (10th Cir.1980); *Gould Inc.*, 221 NLRB 899 (1975), enforced, 550 F.2d 1060 (6th Cir.1977). This argument does not hold water. Even were Gould and other companies doing business with Wisconsin to be discouraged from engaging in certain activities, other companies would most probably do so, thereby affording to the NLRB the opportunity to determine their legality.

Any claim of "chilling" is speculative at best. The enforcement orders on which Gould's "disbarment" occurred were entered prior to the effective date of the State legislation, so that the Wisconsin laws could not possibly have had any effect on Gould's decision whether to appeal. Gould has pointed to no actual instances of chilling and yet contends that the Wisconsin laws would operate to restrict its appeal rights. We find that contention without basis and reject it for the reasons stated.

trict court's award of attorneys' fees based on Gould's preemption claim alone. This argument lacks merit, because we have already explained that no cognizable restriction occurred. Gould's attempted reliance on *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555, and *Inada v. Sullivan*, 523 F.2d 485 (7th Cir.1975), is misplaced. *Inada* dealt with a threat by a police officer that, if true, barred the plaintiff from pursuing his lawful claim against the police officer. Consequently that case dealt with the direct impingement of the individual's rights, a situation not applicable to Gould. *Thiboutot*, while expanding the reach of 42 U.S.C. § 1983, held only that statutory claims raised under Section 1983 were proper claims for which attorneys' fees under 42 U.S.C. § 1988 would be available. The case did not address the issue whether claims based on the Supremacy Clause would be cognizable under Section 1983. The Supreme Court has elsewhere recognized that not all statutes secure rights within the meaning of Section 1983, even though individuals may benefit from their provisions. *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 19, 101 S.Ct. 2615, 2625, 69 L.Ed.2d 435; *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 28, 101 S.Ct. 1531, 1545, 67 L.Ed.2d 694. Section 1983 was enacted to override discriminatory state laws, provide a remedy where state law was inadequate, and furnish a federal remedy where the state remedy, although adequate in theory, was not available in practice. *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492. The Eighth Circuit, when faced with the problem whether a Commerce Clause claim was cognizable under Section 1983, found the function of the

Commerce Clause, relating not to individual rights but rather to the distribution of power between the state and federal governments, to be the dispositive factor. *Consolidated Freightways Corporation of Delaware v. Kassel*, 730 F.2d 1139, 1146 (8th Cir.1984). That court recognized that both the Supremacy and Commerce Clauses "limit the power of a state to interfere with areas of national concern." *Id.* at 1144. After an examination of the purposes of Section 1983 as defined in *Monroe*, the court stated that "[t]o hold that an alleged violation of the Commerce Clause constitutes an action cognizable under § 1983 would fail to serve any of these purposes and would be an unwarranted extension of the Civil Rights Act." *Id.* at 1146. That reasoning applies to the issue before us and similarly bars our allowing attorneys' fees based solely on Gould's success on its preemption claim.[16]

■ But in addition to its preemption claim, Gould raised two Fourteenth Amendment claims, one based on due process and the other on equal protection, both of which are cognizable under Section 1983. Such claims might provide a basis for attorneys' fees under Section 1988. Should the preemption claim on which Gould has prevailed arise out of a common core of facts or be based on legal theories related to its Fourteenth Amendment claims, awarding attorneys' fees would be proper. *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40. Gould has not, however, met this standard. Gould's due process and equal protection arguments centered on the restriction that the Wisconsin statutes placed on Gould's federal rights. But we did not hold the statutes preempted by

---

**16.** The court in *Consolidated Freightways* relied in part on *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508. Its doing so emphasizes the identity in function between the Supremacy Clause and the Commerce Clause. *Chapman* dealt with the question of whether a Supremacy Clause claim brought in district court under 42 U.S.C. § 1343(3) was cognizable under Section 1983, and held that it was not. That result supports the one we reach, although it is not dispositive

since it was based on the wording and legislative history of Section 1343(3). Gould brought its claim based on both 42 U.S.C. § 1331 and Section 1343(3) and therefore had a different jurisdictional predicate. Nonetheless, the variance between the role of the Supremacy Clause and that of Section 1983 in the federal governmental scheme convinces us that Section 1983 does not encompass claims based strictly by preemption.

the NLRA for this reason. As seen, the NLRA preempts the Wisconsin legislation because it imposes a penalty for repeated violations of the NLRA, not because it burdens Gould's appeal right. Since Gould's appeal right is not impermissibly burdened, it has no basis on which to claim attorneys' fees. Consequently they are denied.

The district court's invalidation of the Wisconsin statutes is affirmed, but that part of the decision awarding Gould attorneys' fees is reversed.