784 F.2d 817
 121 L.R.R.M. (BNA) 2819, 27 Wage & Hour Cas. (BN 899,
54 USLW 2460, 104 Lab.Cas. P 11,863,
4 Fed.R.Serv.3d 291, 7 Employee Benefits Ca 1198
 NATIONAL METALCRAFTERS, a DIVISION OF KEYSTONE CONSOLIDATED
INDUSTRIES, Plaintiff, Counterdefendant-Appellant,
v.
Donald J. McNEIL, Superintendent, Wage Claims Division,
Illinois Department of Labor, Defendant-Appellee,
and
Betty Johnson, on behalf of herself and all others similarly
situated, Intervenors-Defendants,
Counterplaintiffs-Appellees.
 No. 85-1263.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 2, 1985.
Decided Feb. 26, 1986.
 
 Mark A. Casciari, Sefarth, Shaw, et al., Chicago, Ill., for plaintiff, counterdefendant-appellant.
 Richard J. Puchalski, Illinois Atty. Gen., Ann C. Hodges, Katz, Friedman, Schur & Eagle, Chicago, Ill., for defendant-appellee.
 Before BAUER and POSNER, Circuit Judges, and GRANT, Senior District Judge.*
 POSNER, Circuit Judge.
 
 
 1
 National Metalcrafters sues for a declaration that the Illinois Wage Payment and Collection Act, Ill.Rev.Stat. ch. 48, paragraphs39m-1 et seq., cannot, consistently with federal law, be used to order an employer to pay vacation benefits to which its workers (many of whom are on strike) are allegedly entitled by a collective bargaining agreement. The federal laws alleged to preempt the wage payment act are the Employees Retirement Income Security Act (ERISA), 29 U.S.C. Secs. 1001 et seq., the National Labor Relations Act, 29 U.S.C. Secs. 151 et seq., and section 301 of the Taft-Hartley Act, 29 U.S.C. Sec. 185. Although virtually every state has a wage payment act of the same general sort as Illinois', and these acts seem rich in potential for conflict with the federal labor and employee financial security laws, few reported cases deal with these acts and none controls the issues in this case.
 
 
 2
 McNeil, the administrator of the Illinois act, ruled that National Metalcrafters had to pay its workers $115,000 in vacation benefits. Rather than pay, National Metalcrafters brought this suit. The workers intervened as parties defendant and counterclaimed under section 301 of the Taft-Hartley Act--claiming that the company's refusal to pay the vacation benefits violated the collective bargaining contract between their union and the company--and alternatively under ERISA, claiming that by failing to pay them the company had violated fiduciary duties imposed by that statute. The district judge held that the Illinois act was not preempted and entered judgment dismissing the company's suit. 602 F.Supp. 232 (N.D.Ill.1985). The judge certified his judgment for an immediate appeal under Rule 54(b) of the Federal Rules of Civil Procedure, and National Metalcrafters has appealed.
 
 
 3
 The pendency in the district court of a counterclaim based on the same facts as the claim which the court dismissed would ordinarily preclude an immediate appeal; a judgment disposing of one of several claims is sufficiently final to be appealable immediately under Rule 54(b) only if the claims do not have a significant factual overlap. See, e.g., Exchange Nat'l Bank v. Daniels, 763 F.2d 286, 291, reheard in part, 768 F.2d 140 (7th Cir.1985); Jack Walters & Sons Corp. v. Morton Building, Inc., 737 F.2d 698, 702 (7th Cir.1984). If they do overlap, it is more economical that they be appealed together. National Metalcrafters argues that its dispute with the workers over vacation benefits cannot give rise to liability under the wage payment act because that act is preempted by federal laws; the counterclaim asserts that the dispute gives rise to liability under two of those laws. Thus the legal theories underlying the complaint and counterclaim are different but arise out of the same dispute, the same facts; and two claims are not separate for purposes of Rule 54(b) merely because one is in the complaint and the other in the countercomplaint. See Tenneco Inc. v. Saxony Bar & Tube, Inc., 776 F.2d 1375, 1378-79 (7th Cir.1985). It is true that the complaint raises an issue of law (federal preemption) rather than of fact, but it is an issue whose intelligent disposition requires familiarity with the parties' dispute and hence with the very issues that will come before this court if and when a final decision on the counterclaim is appealed. In effect the company's suit seeks to erect at the threshold a defense to a suit against it by McNeil; and an order dismissing a defense is not an order that Rule 54(b) allows an immediate appeal from.
 
 
 4
 But there is a separate and adequate ground for the use of Rule 54(b) in this case. An order that disposes finally of a claim against one party to the suit can be certified for an immediate appeal under the rule even if identical claims remain pending between the remaining parties. Walker v. Maccabees Mutual Life Ins. Co., 753 F.2d 599, 601 (7th Cir.1985); Banque Paribas v. Hamilton Industries Int'l, Inc., 767 F.2d 380, 383 (7th Cir.1985). The judge's order in this case disposes, with finality in the district court, of the company's claim against McNeil. He is not a party to the counterclaim. He is out of the case, and the company is entitled to a definitive resolution of its rights against him. This entitlement may benefit McNeil, though that is not a prerequisite to the appeal. He doesn't have to wait till the end of what may be protracted proceedings in the district court to find out for sure whether he is, as the district court found, not violating any rights of the plaintiff.
 
 
 5
 Another threshold issue is whether the district court should have abstained from deciding the company's case against McNeil under the doctrine of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), which forbids a federal court to enjoin a state criminal or quasi-criminal proceeding and certain other types of state enforcement proceeding. See also Middlesex County Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982); W.C.M. Window Co. v. Bernardi, 730 F.2d 486, 490 (7th Cir.1984). An unresolved question is whether a court can ever order abstention under the Younger doctrine when, as in this case (as, indeed, in Younger itself), the state has not asked for it. See discussion in Sequoia Books, Inc. v. McDonald, 725 F.2d 1091, 1094-95 (7th Cir.1984). We need not decide the question in this case, since in any event we do not think the doctrine is applicable.
 
 
 6
 The ruling by Superintendent McNeil which precipitated the company's lawsuit is a statement of intentions rather than a coercive order. His opinion says, "A demand for payment will issue, and the Department will take appropriate legal action to enforce said demand, absent voluntary compliance by the Employer." The wage payment act authorizes the state's Department of Labor "to make complaint in any court of competent jurisdiction of violations of this Act." Ill.Rev.Stat. ch. 48, p 39m-11(c). But no such complaint has yet been filed. We may assume without having to decide that if such a complaint had been filed, Younger would have required the district court to stay further proceedings in the present suit, thus forcing National Metalcrafters to make its argument for preemption by way of defense in the state court suit. The tentativeness of "assume without having to decide" is due to uncertainties about the precise range of civil actions to which the doctrine of Younger applies, see W.C.M. Window Co. v. Bernardi, supra, 730 F.2d at 490, and would disappear of course if a criminal action to enforce the wage payment act had been brought against National Metalcrafters; the act provides for criminal sanctions. See Ill.Rev.Stat. ch. 48, p 39m-14. It would not matter whether the criminal action was brought before the federal case or after, provided that substantial proceedings had not yet taken place in the federal case. The application of the Younger doctrine does not depend on who gets to which courthouse first. Hicks v. Miranda, 422 U.S. 332, 348-49, 95 S.Ct. 2281, 2291-92, 45 L.Ed.2d 223 (1975).
 
 
 7
 But with no state proceeding having been brought, National Metalcrafters has no remedy in state court against the alleged unconstitutional application of the wage payment act (alleged to be unconstitutional under the supremacy clause because in conflict with valid federal law). This clears out Younger as an obstacle to maintaining this suit but creates another obstacle--the possibility that the suit is unripe. If you violate a state law and nothing is done about it, this may indicate that the law is not being enforced and that you have no practical interest therefore in getting the law enjoined. But that is not this case. The state in a formal proceeding has authoritatively declared National Metalcrafters to be in violation of the statute, and while the state seems content to abide the results of National Metalcrafters' suit before bringing a criminal or other enforcement suit against the company, the workers who are the beneficiaries of the statute have by their counterclaim in the present suit demonstrated the practical consequences of Superintendent McNeil's ruling; for although the counterclaim is based on federal law rather than the wage payment act, the workers have cited McNeil's ruling in support of their interpretation of the collective bargaining agreement. The considerations that led us to dismiss as unripe an attempt to enjoin threatened state enforcement proceedings in Nuclear Engineering Co. v. Scott, 660 F.2d 241, 252-53 (7th Cir.1981), are thus absent. See also Illinois v. General Elec. Co., 683 F.2d 206, 210-11 (7th Cir.1982).
 
 
 8
 Coming to the merits of the appeal, we face first a question of judicial tactics: whether to consider all three of National Metalcrafters' grounds for preemption of the wage payment act or fewer than all three, as we can do if we find at least one to be valid. It might seem that one ground would always be enough, that to go on and discuss others would just dilute the force of our decision--there would be no holding, just alternative holdings. And a dubious holding bracketed as it were by sound holdings might cause mischief in the law, because the Supreme Court rarely grants review to decide an issue that is irrelevant to the outcome of the case. See Scalia, Vermont Yankee: The APA, the D.C. Circuit, and the Supreme Court, 1978 S.Ct.Rev. 345, 372-73. The other side of the coin, however, is that piecemeal consideration of the grounds for appeal may result in successive remands that greatly prolong the litigation; an example from criminal law is discussed in Reimnitz v. State's Attorney, 761 F.2d 405 (7th Cir.1985). Moreover, there is a benefit to resolving legal questions that are squarely presented, fully ripe, and fully argued: their resolution provides guidance to the community, and reduces legal uncertainty.
 
 
 9
 The issue we are most reluctant to decide is whether the Illinois wage payment act is preempted by ERISA. It is a difficult issue and if resolved in favor of preemption would have far-reaching consequences. It would apply not merely to companies that have collective bargaining contracts but to all companies, even those without pension plans. It would subject all companies with vacation plans to the elaborate requirements that ERISA imposes on plans within its scope, would broadly displace the regulation of vacation benefits by state law, and could bring a host of trivial cases into the federal courts. We do not have to reach the issue of preemption under ERISA because, as we are about to see, the application of Illinois' wage payment act to this particular dispute is preempted by both the National Labor Relations Act and section 301 of the Taft-Hartley Act; and we shall not reach it, or drop the slightest hint about its correct resolution.
 
 
 10
 The issue of preemption by the federal labor statutes is focused by considering the particulars of the company's dispute with the union. A collective bargaining contract that expired on April 16, 1983, provided that "an eligible employee who has attained the length of service indicated below as of July 1, 1980, or any subsequent year during the term of this Agreement, shall receive a vacation corresponding to such length of service with vacation pay as shown in the following table...." For example, a worker with 20 or more years of service would be entitled to four weeks of vacation and 9 percent "of the employee's straight-time earnings for the year period prior to May 1 of the vacation year." The contract also provided that "an employee who is terminated on or after January 1 but prior to July 1 of any year during the term of this Agreement shall receive a vacation payment at time of termination, or as soon thereafter as practicable," pro rated from the table. When the contract expired, the union called a strike. In July, with the strike still in progress, the company paid its workers, including those who were out on strike, vacation pay for the year ending May 1, 1983, computed however on a basis generally though not invariably less favorable to the workers than the table in the expired contract. A worker with 20 years service was entitled to only three weeks of vacation, and 6.5 percent of his previous year's earnings (compared to four weeks and 9 percent under the expired contract); but a worker with only 3 years service did better under the new scheme than the old. The changes in vacation arrangements that the company thus unilaterally adopted were the same as it had proposed in unsuccessful negotiations with the union for a new contract to replace the one that had expired in April. Hundreds of employees complained to the Illinois Department of Labor, precipitating McNeil's ruling, which concluded that the company had violated the contract.
 
 
 11
 Section 301 of the Taft-Hartley Act creates a federal remedy for the breach of a collective bargaining agreement. The remedy is exclusive; no action to enforce such an agreement may be based on state law. Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957); Mitchell v. Pepsi-Cola Bottlers, Inc., 772 F.2d 342, 345 (7th Cir.1985). McNeil argues that section 301 is no bar to his enforcing the state's wage payment act against National Metalcrafters, and this for two reasons: that the wage payment act does not grant a remedy for breach of contract, but punishes conduct in the nature of conversion or fraud; and that he did not interpret the contract but merely applied an unequivocal term in it. Although the act is not entirely clear in this regard, McNeil interprets it as limited to cases where the employer's refusal to pay wages or benefits amounts to willful nonpayment of money due for past work and therefore already earned. If the employer's obligation is unclear or debatable the act is inapplicable--which, McNeil argues, prevents a collision with section 301.
 
 
 12
 But a determination that a contract is so clear as to make a breach willful (setting to one side the question of a breach that, while knowing, is not willful, because it is involuntary--e.g., the company just has run out of money) is an interpretation of the contract, as the facts of this case make clear. The contract expired before July 1, which was when vacation pay became due under its terms for the work year that had ended on May 1. The issue before McNeil was the effect of expiration. The company conceded that the workers were entitled to some vacation pay but argued that the proper rate of pay was that in effect on July 1--the generally less generous rate that the company had adopted after the collective bargaining contract had expired. McNeil, noting that any worker who had been terminated between January 1 and April 16 would have been entitled to vacation pay pro rated according to the table in the contract, while if the company were right a worker who had continued to work after that would be entitled to vacation pay at a different (and generally lower) rate, thought that "no reasonable person ... could have read the 1980 Contract and expected such an illogical outcome, in which one earns more by failing to complete the vacation year."
 
 
 13
 This is an overstatement. If the company had adopted a vacation plan more favorable to the workers than the plan in the old contract, as for a variety of reasons it might have done (the new plan was more favorable, to younger workers), the interpretation for which the company was contending would not result in so "illogical" an outcome. More important, McNeil was reading into the contract an implicit provision vesting the vacation pay rights granted in the contract as of the date when a worker complied with the preconditions laid down in the contract, even if that date followed the expiration of the contract. Remember that the contract made the rate of vacation pay depend on one's earnings in the year ending May 1, which fell after the contract had expired. Nevertheless under McNeil's view any worker still on the payroll on July 1 was entitled to vacation pay on the terms in the collective bargaining contract, even though the contract had expired not only before July 1 but before May 1, when the work year ended. The contract contains no provision regarding the vesting of rights in its last year; McNeil plugged the gap.
 
 
 14
 His interpretation of the contract may have been correct, an issue we do not want to prejudge. But it was an interpretation. The company was not violating what any fool would know was an express obligation of the contract. It was exploiting a gap in the language of the contract. A court or arbitrator might fill the gap just as McNeil did, by interpreting the silence of the contract as pregnant in light of other provisions; the arbitrator's decision that we upheld in Ethyl Corp. v. United Steelworkers, 768 F.2d 180 (7th Cir.1985), a factually analogous case, was such an interpretation; but it can be made only in a proceeding under section 301. If there is an arguable contract dispute, and there is here, the power to resolve it is confined to such proceedings.
 
 
 15
 In the usual case in which section 301 is alleged to preempt state law, the state law claim is not a contract claim but a tort claim, and the issue is whether nonetheless "resolution of [the] state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract." Allis-Chalmers Corp. v. Lueck, --- U.S. ----, 105 S.Ct. 1904, 1916, 85 L.Ed.2d 206 (1985). See also our recent decision in Gibson v. A T & T Technologies, Inc., 782 F.2d 686 (7th Cir.1986). The only basis of the state-law claim in this case is that the company broke its contract to grant vacation pay of a certain amount. No state law required that any vacation pay be given or fixed the rate of such pay if given. This is not a case like Metropolitan Life Ins. Co. v. Massachusetts, --- U.S. ----, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985), where state law required employers who bought health insurance for their employees to insist on certain terms in the policies. The state law created an entitlement that was independent of the collective bargaining contract. No issue of contract interpretation could have arisen, and preemption by virtue of section 301 was not even argued. The only thing the state law at issue in this case requires is that the employer honor his contract. To decide whether he has done so requires interpreting the contract, unless, perhaps, the particular contractual provision is so clear as to preclude all possible dispute over its meaning, but it is not.
 
 
 16
 This case is not like Whelan's Inc. v. Kansas Dept. of Human Resources, 235 Kan. 425, 681 P.2d 621 (1984), where the state's wage payment act required as in this case that vacation benefits be paid at the wage rates in force when the benefits were earned but there was no dispute over when they had been earned. Again no argument of preemption based on section 301 was made, since there was no dispute over the meaning of the parties' contract.
 
 
 17
 Although Carpenters Health & Welfare Fund v. Kenneth R. Ambrose, Inc., 727 F.2d 279, 282 n. 5 (3d Cir.1983), rejected contentions that Pennsylvania's wage payment act was preempted by either ERISA or the Taft-Hartley Act, the court's entire discussion of the issue consists of the statement, "we find that these contentions are without merit." The particulars of the contentions and the grounds of the court's action are inscrutable.
 
 
 18
 These cases, moreover, are placed under a shadow by the Supreme Court's recent decision in Lueck. A worker sued his employer and the insurance company that administered the provisions of the collective bargaining agreement relating to disability benefits, charging a refusal, in bad faith, to honor his claim for benefits. Although the tort of refusing in bad faith to honor an insurance claim requires "a breach of contract which is not even 'fairly debatable,' " 105 S.Ct. at 1915 n. 13, this was not enough to avoid the preemption of the tort by section 301. One might have thought that if the breach was indeed not fairly debatable, there could be no possible conflict between state and federal principles for interpreting contracts. The Court in Lueck disagreed, perhaps because one person's incontestable contract reading is another's fairly debatable one. The present case is a much stronger one for preemption, as the question whether the employer broke the contract is "fairly debatable."
 
 
 19
 McNeil argues that National Metalcrafters has waived its argument based on section 301 by failing to make it in the district court. National Metalcrafters did argue that the wage payment act was preempted by federal labor law, but the only specific law it mentioned was the National Labor Relations Act; and an issue is not properly reserved by perfunctory invocation of a vast and variegated body of law--by pointing to Title 29 of the United States Code and inviting the district judge to thumb through it for some ground on which the party extending the invitation can win. We have refused to consider a ground for reversal that the appellant had raised but that had been "presented in so perfunctory and underdeveloped a manner in his brief that we shall not consider it." Hershinow v. Bonamarte, 735 F.2d 264, 266 (7th Cir.1984); see also Carducci v. Regan, 714 F.2d 171, 177 (D.C.Cir.1983). A district judge is likewise entitled to disregard a ground raised but not pressed.
 
 
 20
 But like almost every other principle of law, that which adjures courts not to reverse on grounds (other than grounds going to the court's subject-matter jurisdiction) not pressed below has its exceptions. See, e.g., Singleton v. Wulff, 428 U.S. 106, 120-21, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); Marrese v. Interqual, Inc., 748 F.2d 373, 384 (7th Cir.1984); Capitol Indemnity Corp. v. Keller, 717 F.2d 324, 329 (7th Cir.1983); New York, N.H. & H.R. Co. v. Reconstruction Finance Corp., 180 F.2d 241, 244 (2d Cir.1950) (L. Hand, J.). Even those of us who are most emphatic in our opposition to reversing decisions on the basis of grounds not properly preserved by the appellant recognize that our opposition must yield "in exceptional circumstances," Tom v. Heckler, 779 F.2d 1250, 1259 (7th Cir.1985) (dissenting opinion), as where the ground is based on strongly held policies demarcating the spheres of competence of state and federal government. Younger v. Harris, supra, which involved interference by a federal district court with an essential state function, that of prosecuting criminal offenders, was such a case, and the Supreme Court reversed although the appellant had not asked for reversal on that ground. See 401 U.S. at 40, 91 S.Ct. at 748; Schlesinger v. Councilman, 420 U.S. 738, 743, 95 S.Ct. 1300, 1305, 43 L.Ed.2d 591 (1975). Section 301 expresses a strongly held policy in favor of applying uniform federal principles to the interpretation of collective bargaining contracts. This policy reflects the national commitment to limiting state regulation of labor relations that grows out of the history of hostility in some states to the labor movement.
 
 
 21
 Of course there is a difference between a court's staying its hand and a court's reaching out to forbid another branch of government from acting; so we do not suggest that the case for overlooking the appellant's failure properly to preserve one of its grounds for appeal is the same here as in Younger. There are, however, other features of this case which mitigate the gravity of the appellant's oversight. The issue of preemption by section 301 has been fully briefed and argued on appeal. It does not require for its resolution any factual determinations, so there is no question of the company's having derived some advantage from bypassing the district court or of our being placed at a disadvantage in reviewing the issue by the absence of a determination on it in that court. As we are about to see, the issue is logically as well as factually intertwined with the issue that National Metalcrafters did raise of preemption by the National Labor Relations Act. Lueck, which provides in our view decisive support for finding preemption under section 301 in this case, came down after the district court's decision in this case, and the timing provides at least a partial excuse for National Metalcrafters' failure to press the section 301 issue in that court. Finally, National Metalcrafters did raise the issue in the district court, if inadequately; and since it was complaining that McNeil had improperly as well as incorrectly interpreted the collective bargaining agreement, using principles of state rather than federal law, the existence of an issue of preemption under section 301 fairly shouted from the facts. Cf. Callejo v. Bancomer, S.A., 764 F.2d 1101, 1112 n. 11 (5th Cir.1985); Rebaldo v. Cuomo, 749 F.2d 133, 137 (2d Cir.1984); Texas v. United States, 730 F.2d 339, 358 n. 35 (5th Cir.1984). Considering the circumstances, we cannot see what there is to be gained from refusing to decide the issue.
 
 
 22
 We could stop here, having found that McNeil's ruling is made unenforceable by section 301 of the Taft-Hartley Act; but the other ground for preemption, that based on the National Labor Relations Act and raised and decided in the district court, is so closely related to the section 301 ground that we shall press on. A company's repudiation of a term in its collective bargaining agreement is likely to raise questions under both section 301 and the NLRA; and just as section 301 is exclusive in its sphere, so conduct that may be within the scope of the NLRA, which is to say conduct that the National Labor Relations Board might hold either to be forbidden by the Act or privileged by the Act, may not be regulated under state law. San Diego Building Trades Council v. Garmon, 359 U.S. 236, 244-45, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959); Gould, Inc. v. Wisconsin Dept. of Industry, Labor & Human Relations, 750 F.2d 608, 610 (7th Cir.1984), prob. juris. noted, --- U.S. ----, 105 S.Ct. 2356, 86 L.Ed.2d 257 (1985). Passed against a background of unhappy experience with state regulation of labor relations, and embodying a delicate balance between the rights of employers and of unions, the Act has been interpreted to forbid the states to attempt to regulate labor relations in the industries subject to it.
 
 
 23
 The union originally thought that the company's action in unilaterally implementing its altered vacation pay plan indeed violated the National Labor Relations Act, for it filed a complaint (later withdrawn) with the Labor Board. Section 8(a)(1) of the Act, 29 U.S.C. Sec. 158(a)(1), forbids employers to interfere with union activities; and here the altered plan was put into effect during a strike. Section 8(a)(5), 29 U.S.C. Sec. 158(a)(5), forbids the employer to refuse to bargain in good faith with a union representing its employees; and one form that such a refusal can take is for the employer to change the terms or conditions of employment unilaterally, before having bargained to a deadlock ("impasse," in the accepted jargon). If it has bargained to a deadlock it can make such changes, provided that they are within the scope of its proposals during the bargaining period, see, e.g., Western Newspaper Publishing Co., 269 N.L.R.B. 355 (1984), and cases cited there, and are not motivated by hostility to the union, which would bring section 8(a)(1) into play. See generally Carpenter Sprinkler Corp. v. NLRB, 605 F.2d 60, 64-65 (2d Cir.1979).
 
 
 24
 When the contract in this case expired, the union called a strike, and the company then put the new vacation arrangements into effect. If, as the company argues, it was effectuating the very proposal which it had made to the union and about which it had bargained to an impasse, its conduct was protected. See, e.g., Western Newspaper Publishing Co., supra, 269 N.L.R.B. at 356-57; Struthers Wells Corp. v. NLRB, 721 F.2d 465, 472 (3d Cir.1983). "Impasse" signifies that the parties have been unable to come to terms, after honestly trying to do so. If before this happens the company unilaterally changes the terms or conditions of work, it is bypassing the bargaining process, and therefore is not bargaining in good faith. And if after an apparent impasse the company puts into effect a change that it had not laid on the bargaining table, this implies that the company had held something back from the negotiations, so again it could not have been bargaining in good faith. See the lucid discussion of these matters in NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). It may seem that if, as McNeil found, the company was depriving its employees of vested rights created by a collective bargaining contract, it could not have been implementing the company's collective bargaining proposal, because that was a proposal for changing the next collective bargaining agreement. But all that this would prove, if it were true, was that the company really had violated the National Labor Relations Act, in which event state regulation would be preempted. And it might not be true. A union might decide to surrender some vested rights of its members if, for example, that was necessary in order to keep the company from shutting down a plant and throwing all the workers out of work; so a proposal for such a "give back" is not necessarily inconsistent with serious bargaining.
 
 
 25
 Another possibility is that the company was trying to send the striking workers a message that the strike was futile, since at best it could lead to a new collective bargaining contract and the company had just shown that the last contract was just a scrap of paper. This would violate both sections 8(a)(1) and 8(a)(5), as it would undermine both the union and the bargaining process. See Robbins Door & Sash Co., 260 N.L.R.B. 659, 662 (1982); Stokely-Van Camp, Inc., 259 N.L.R.B. 961 (1982), rev'd, 722 F.2d 1324 (7th Cir.1983). (We reversed Stokely-Van Camp because we found that the Labor Board's order was not supported by substantial evidence; the principle was not disturbed.). This would be especially clear if the company was trying to place financial pressure on the strikers to return to work by giving them less vacation pay than they had earned. The strikers may have been counting on that pay to tide them over the period of the strike. It may not be an accident that the new vacation plan benefits younger at the expense of older workers; the latter tend to be stronger union adherents. The company may have been playing divide and conquer.
 
 
 26
 Against all this McNeil argues that the wage payment act, like a minimum wage or maximum hours law, does no more than set certain minimum terms of employment; and the enforcement of those terms, being required by state law, simply is outside the regulatory domain of the Labor Board. The National Labor Relations Act sets the ground rules for economic warfare; but if a state withdraws a part of the employment relationship from that warfare, by requiring a mandatory term in every employment contract, as in the Metropolitan Life case discussed earlier, that part is no longer within the Board's purview.
 
 
 27
 The problem with this argument is that the wage payment act does not require any terms in the employment contract. It just requires the employer to stick to the terms it has negotiated with the employee or the employee's bargaining representative. It is precisely because vacation time and vacation pay are negotiable that the company, by (arguably) flouting the vacation provision of the old contract, can send a signal to the workers that it is no use authorizing a union to negotiate with it. The state has simply created a new remedy for violations of collective bargaining agreements. Nor is the statute a public benefits program that happens to benefit labor over management, like the statute in New York Tel. Co. v. New York State Dept. of Labor, 440 U.S. 519, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979), which entitled striking workers to unemployment benefits. When applied as in this case to a disputed term of a collective bargaining contract whose expiration precipitated a strike, the wage payment act injects state officials into labor disputes over which the National Labor Relations Board has exclusive jurisdiction.
 
 
 28
 McNeil also appeals to a line of cases in which state regulation of conduct within the scope of the National Labor Relations Act has been held not to be preempted because the regulation "touches interests deeply rooted in local feeling and responsibility." Belknap v. Hale, 463 U.S. 491, 498, 103 S.Ct. 3172, 3177, 77 L.Ed.2d 798 (1983). If an employer hires goons to beat up picketers, this violates the Act, but it also is a common law battery, and the state is not forbidden to provide the usual tort remedy for it. The enforcement of laws of general applicability that may happen to be violated during strikes as during other disputes is unlikely to disrupt the Labor Board's regulation of labor relations. The wage payment act, however, as applied in this case (an important qualification, of which more shortly), in effect authorizes a state official to inject himself into the bargaining process and threaten the company with a fine for making a unilateral change in the terms of employment in violation of an expired collective bargaining agreement. The potential for interference with the system of collective bargaining is too great to allow us to place this case within the "local feeling and responsibility" exception.
 
 
 29
 Thus the application of Illinois' wage payment act to this dispute over vacation pay is doubly preempted: by section 301 of the Taft-Hartley Act and by section 8 of the National Labor Relations Act. This conclusion does not leave employees who are in the position of the intervenors in this case, or for that matter these intervenors, without remedy. If an employer violates a collective bargaining contract, there is a remedy under section 301 (if he does not violate it, there is not--but the whole premise of McNeil's action is that the company violated the contract); and the counterclaim, which remains pending in the district court, seeks it. If the employer commits an unfair labor practice, there is a public remedy under the National Labor Relations Act; the remedies under that Act and under section 301 are not mutually exclusive. There just is no state remedy.
 
 
 30
 Do not exaggerate the scope of our holding. We are not striking down the wage payment act. The act can continue to be applied in employment settings--the majority--where there is no collective bargaining contract and no labor dispute within the purview of the National Labor Relations Board. And even if there is a contract, if its meaning is so clear that the company cannot in good faith dispute the workers' vested rights to benefits under it, the state will not be prevented from enforcing the wage payment act by section 301 of the Taft-Hartley Act, as interpreted in this opinion (Lueck may go further); and unless the dispute arises as it did in this case out of the collective bargaining negotiations, not by the National Labor Relations Act either. Even if it does arise out of such negotiations, if the refusal to honor the contract is in such patent bad faith as to partake of the wrongfulness associated with some of the traditional common law intentional torts, conceivably the application of the wage payment act would not be preempted, though this is not an issue we need decide in this case.
 
 
 31
 The judgment is reversed with directions to enter judgment for National Metalcrafters on its complaint against McNeil.
 
 
 
 *
 Hon. Robert A. Grant, of the Northern District of Indiana, sitting by designation