**GEHL COMPANY, Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 85–1326.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 19, 1986.

Decided July 9, 1986.

As Corrected July 10, 1986.

Davit S. Lott, Foley & Lardner, Milwaukee, Wis., for petitioner-appellant.

David English Carmack, Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before CUMMINGS, Chief Judge, COFFEY, Circuit Judge, and WILL, Senior District Judge.*

CUMMINGS, Chief Judge.

This case comes to us on appeal from the United States Tax Court, which found in favor of the respondent Commissioner of Internal Revenue ("Commissioner") against the petitioner Gehl Company ("Gehl"). The first issue raised is whether Treasury Regulation § 1.993–2(d)(2), which sets down rules limiting the classification of commissions owed to a domestic international sales corporation ("DISC") as "qualified export assets" as that term is defined by Section 993(b) of the Internal Revenue Code,[1] is a valid regulation. A second related issue is, assuming that the cited Treasury regulation is valid, whether that regulation can be applied retroactively. For the reasons set forth below, we agree with the Tax Court

---

* The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

1. All statutory references herein are to provisions in the Internal Revenue Code of 1954 (26 U.S.C.).

that Treasury Regulation § 1.993–2(d)(2) is valid but disagree that it can be applied retroactively.

## I

Since the facts have been fully stipulated, only a brief summary is necessary. Gehl and Gehl International, Inc. ("International") are both corporations organized under the laws of Wisconsin, and at all relevant times International was wholly owned by Gehl. During the relevant time period, Gehl was engaged in the manufacture, domestic sale and export of agricultural machinery and equipment. In 1972 International elected to be treated as a DISC under the Internal Revenue Code. International's sole function was to act as a commission agent for items it exported on Gehl's behalf; *i.e.*, a so-called "commission agent DISC." See, *e.g.*, Rendell, *Use of a Domestic International Sales Corporation to Reduce Federal Income Tax on Export Earnings*, 11 San Diego L.Rev. 138, 145–146 (1973). Gehl is a related supplier with respect to International. Commissions were to be paid each month from Gehl to International on all qualified export sales made during the month at the rate of four and one-half percent. Gehl and International utilized the accrual method of accounting. Gehl operates on a calendar year, while International's fiscal year ends on January 31.

At issue is International's qualification as a DISC under Section 992 for its taxable years ended January 31 of 1976, 1977, 1978, and 1979. The adjusted basis of International's total assets on the dates listed below was as follows:

| Year ended | Amount |
|---|---|
| January 31, 1976 | $ 814,378 |
| January 31, 1977 | 922,287 |
| January 31, 1978 | 937,806 |
| January 31, 1979 | 1,031,016 |

The accrued commissions owed to International by Gehl on the dates listed below were as follows:

| Date | Amount |
|---|---|
| January 31, 1976 | $ 674,855 |
| January 31, 1977 | 569,120 |
| January 31, 1978 | 493,208 |
| January 31, 1979 | 463,345 |

Gehl paid the commissions as follows:

| Taxable Year | Date of Payment | Amount | Total for Year |
|---|---|---|---|
| 1976 | February 12, 1976 | $ 3,000 | |
| | April 5, 1976 | 12,000 | |
| | April 26, 1976 | 204,000 | |
| | May 25, 1976 | 5,000 | |
| | June 2, 1976 | 1,000 | |
| | July 12, 1976 | 8,000 | |
| | October 8, 1976 | 441,855 | |
| | | | $674,855 |
| 1977 | January 10, 1977 | $ 8,000 | |
| | April 4, 1977 | 3,600 | |
| | April 22, 1977 | 189,000 | |
| | June 7, 1977 | 7,000 | |
| | July 7, 1977 | 7,989 | |
| | October 11, 1977 | 362,270 | |
| | | | $577,859 |
| 1978 | February 17, 1978 | $ 1,000 | |
| | April 13, 1978 | 6,000 | |
| | April 24, 1978 | 234,000 | |
| | May 12, 1978 | 6,000 | |
| | June 19, 1978 | 2,090 | |
| | July 12, 1978 | 6,000 | |
| | October 11, 1978 | 240,208 | |
| | | | $495,298 |
| 1979 | February 5, 1979 | $ 6,940 | |
| | April 4, 1979 | 5,000 | |
| | April 24, 1979 | 242,000 | |
| | July 9, 1979 | 6,500 | |
| | July 19, 1979 | 5,100 | |
| | October 11, 1979 | 197,805 | |
| | | | $463,345 |

As the above illustrates, the commissions receivable of International at the close of its taxable years ended January 31, 1976, 1977, 1978, and 1979, were not fully paid by Gehl within sixty days of such dates (by March 30, 1976, 1977, 1978, and 1979, respectively). Specifically, by sixty days after the close of those tax years, Gehl had paid only .44 percent, 1.41 percent, .20 percent, and 1.50 percent, respectively, of the accrued commissions for those years. The commissions were fully paid, however, by the respective due dates of International's returns for such years (October 15, 1976, 1977, 1978, and 1979).[2]

---

**2.** Section 6072(b) provides in part that DISC returns shall be filed on or before the fifteenth day of the ninth month following the close of the DISC's taxable year.

The basis for the pertinent adjustments in the Commissioner's notice of deficiency to Gehl was his determination that International did not qualify as a DISC under Section 992 for its tax years ended January 31, 1976, 1977, 1978, and 1979. The Commissioner's determination was based on his position that International did not satisfy the 95 percent "qualified export assets" test of Section 992(a)(1)(B), because its commissions receivable from Gehl on January 31, 1976, 1977, 1978, and 1979, were not paid within sixty days of those dates, as required by Treasury Regulation § 1.993–2(d)(2),[3] and thus did not constitute "qualified export assets" under Section 993(b).

The Tax Court upheld the Commissioner's determination. The Tax Court rejected Gehl's argument that the sixty-day payment requirement of the regulations was invalid. Additionally, the Tax Court rejected Gehl's argument that it had substantially complied with this regulatory requirement and that nothing more was necessary. From the decision entered against Gehl, this appeal followed.

Before answering the specific issue raised in this case, we briefly review the DISC provisions of the Code as a whole so that it may be better determined whether the challenged regulation comports with the overall statutory scheme.

## II

The DISC legislation was passed as part of the Revenue Act of 1971.[4] Generally speaking, a DISC is a domestic corporation whose income is derived mostly from sale and lease transactions and whose properties consist chiefly of "qualified" export-related assets. Bittker & Eustice, FEDERAL INCOME TAXATION OF CORPORATIONS AND SHAREHOLDERS ¶ 17.14.1 (4th Ed.1979) (hereinafter referred to as "Bittker & Eustice"). The principal function of a DISC under the basic definitional terms set out in Section 993 "is the selling or leasing of export property which has been created by someone else in the United States for ultimate use outside the United States." Bittker & Eustice ¶ 17.14.2. To qualify as a DISC, a corporation must satisfy several requirements, including two basic definitional elements: the "export receipts" test (Section 992(a)(1)(A)), and the "export assets" test (Section 992(a)(1)(B)). The first test requires 95 percent of a DISC's gross receipts to be, generally speaking, receipts that derive from export sales or lease transactions, and from certain export-related activities or investments ("qualified export receipts"). Bittker & Eustice ¶ 17.14.-2. The second test, and the test at issue in the instant case, requires 95 percent of a DISC's assets at the close of its taxable year to be, generally speaking, export-related properties, "such as property held for sale or lease abroad, and the nonmanufacturing operating assets associated with such export activities" ("qualified export assets"). *Id.* A corporation that meets these two tests will thus fulfill the principal function of a DISC as described above.

Several parts of the DISC provisions regulate transactions and transfers involving the flow of the DISC's tax-deferred profits to related entities in order to preserve the integrity of the DISC's basic definitional elements described above. One important concept in this regard is the "producer's loan," defined in Section 993(d). This is a loan by a DISC, from its tax-deferred profits, to an affiliated U.S. parent corporation

---

**3.** The specific time limitations are contained in Treasury Regulation § 1.994–1(e)(3). Treasury Regulation § 1.993–2(d)(2) adopts these limitations by reference.

**4.** Subsequent to the passage of the DISC provisions, the European Economic Community complained that the DISC system constituted an illegal export subsidy in violation of the General Agreement on Tariffs and Trade. As a result, the Tax Reform Act of 1984 replaced many of

the tax rules that had been applicable to DISC's with new rules that are applicable to Foreign Sales Corporations. DISCs were not abolished, but their tax benefits were limited, and an interest charge on tax-deferred amounts was imposed on DISC shareholders. See generally 86 Vol. 7 STAND. FED.TAX REP. (CCH) ¶¶ 4399DD.01, 4399HH.-02, 4399R.001; Bittker & Eustice, FEDERAL INCOME TAXATION OF CORPORATIONS AND SHAREHOLDERS ¶ 17.-14.6 (1985 Cum.Supp. No. 1).

producer of export property (in this case a loan from International to Gehl). Such a loan must meet many rules to qualify as a producer's loan, and only if it so qualifies can the DISC include the loan as a qualified export asset, Section 993(b)(5), and the interest on the loan as qualified export receipts, Section 993(a)(1)(F). Bittker & Eustice ¶ 17.14.2. Another Section which serves this purpose is Section 994, which sets forth special inter-company pricing rules regulating sales by a related supplier such as Gehl to a DISC such as International, and the allocation of profits between them. See generally Bittker & Eustice ¶ 17.14.3. More precisely, Section 994(b) and Treasury Regulation § 1.994–1(e)(3) govern payments from a related supplier to the DISC in a transaction to which the inter-company pricing rules apply.

If a corporation qualifies as a DISC, then it is entitled to certain income tax benefits. In particular, such a corporation is not subject to federal income tax at the corporate level. Instead, roughly one-half of a DISC's earnings is taxed currently to its shareholders as constructive dividends, regardless of whether such earnings are actually distributed. Bittker & Eustice ¶ 17.-14.1. The remainder of a DISC's earnings are not taxable to its shareholders until the earnings are actually distributed to them, or the shareholders dispose of their stock in a taxable transaction, or the corporation no longer qualifies as a DISC, at which time the earnings are taxed at the shareholder level as a dividend. *Id.* "In effect, taxation is deferred for approximately one-half the export earnings of a DISC, the other half being subject to current taxation, as constructive dividends, at the shareholder level." *Id.*

The export assets test, the requirement of a DISC that the Commissioner alleges that International has not satisfied for the years in question, requires at least 95 percent of a DISC's assets to consist of qualified export assets. Section 992(a)(1)(B). Under Section 993(b)(3), qualified export assets include accounts receivable that arise by reason of certain transactions of the DISC. Section 993(b), which defines the

term qualified export assets, does not specifically mention commissions receivable as constituting qualified export assets.

The regulations under Section 993 deal with this type of qualified export asset in greater detail. Treasury Regulation § 1.993–2(a)(3) uses the term "trade receivables" as the type of receivable which is included as qualified export assets. The regulations provide that commissions receivable are treated as trade receivables, and hence qualified export assets, under certain conditions. Specifically, Treasury Regulation § 1.993–2(d)(2) provides, in pertinent part, that:

> (2) *Trade receivables representing commissions.* If a DISC acts as commission agent for a principal in a transaction ... which results in qualified export receipts for the DISC, and if an account receivable or evidence of indebtedness held by the DISC and representing the commission payable to the DISC as a result of the transaction arises ... such account receivable or evidence of indebtedness shall be treated as a trade receivable. If, however, the principal is a related supplier ... with respect to the DISC, such account receivable or evidence of indebtedness will not be treated as a trade receivable unless it is payable and paid in a time and manner which satisfy the requirements of § 1.994–1(e)(3) ... (relating to initial payment of transfer price or commission ...)....

Treasury Regulation § 1.994–1(e)(3) provides, in pertinent part, that:

> (3) *Initial payment of transfer price or commission.* (i) The amount of ... a sales commission (or reasonable estimate thereof) actually charged by a DISC to a related supplier ... must be paid no later than 60 days following the close of the taxable year of the DISC during which the transaction occurred.
>
> *         *         *         *         *         *
>
> (iv)(a) Except with respect to incomplete transactions ... if the amount actually paid results in the DISC realizing at least 50 percent of the DISC's taxable income

from the transaction as reported in its tax return for the taxable year the transaction is completed, then the amount actually paid shall be deemed to be a reasonable estimate of such transfer price or commission.

There is no dispute that, given the facts previously summarized and stipulated to by the parties, under these regulations International's commission receivables for the taxable years ended January 31, 1976, 1977, 1978, and 1979, are not treated as qualified export assets, and therefore International does not qualify as a DISC for these years. Gehl raises three issues in connection with this disqualification. First, Gehl contends that Treasury Regulation § 1.993–2(d)(2) is invalid insofar as it imposes a sixty-day payment rule as a prerequisite for treating commissions payable by a related supplier as qualified export assets.[5] Second, Gehl contends that this regulation requires no more than substantial compliance, which it claims it satisfied. Third, Gehl claims that this regulation, which was adopted October 14, 1977, cannot be applied retroactively, and so therefore International's commissions receivable for the taxable years ended January 31, 1976, and 1977, would be qualified export assets. Each of Gehl's contentions is addressed in turn.

### III

█ Our role in determining the validity of a Treasury regulation is a limited one. A court should ordinarily defer to the regulation if it "implement[s] the congressional mandate in some reasonable manner."

*United States v. Correll*, 389 U.S. 299, 307, 88 S.Ct. 445, 450, 19 L.Ed.2d 537, quoted in *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 24, 102 S.Ct. 821, 827, 70 L.Ed.2d 792; *Rowan Company, Inc. v. United States*, 452 U.S. 247, 252, 101 S.Ct. 2288, 2292, 68 L.Ed.2d 814; *Commissioner v. Portland Cement Co. of Utah*, 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140; *National Muffler Dealers Association v. United States*, 440 U.S. 472, 476, 99 S.Ct. 1304, 1306, 59 L.Ed.2d 519; *United States v. Cartwright*, 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528; *Kreider v. Commissioner*, 762 F.2d 580, 590 (7th Cir.1985). But this general deferential standard is only the beginning of the necessary analysis. *Vogel*, 455 U.S. at 24, 102 S.Ct. at 827; *Cartwright*, 411 U.S. at 550, 93 S.Ct. at 1716. This standard is further refined by the source of authority under which the challenged regulation was issued. A regulation may be promulgated under the Commissioner's general authority to "prescribe all needful rules and regulations," Section 7805(a),[6] or it may be promulgated under a specific statutory grant of authority, see, *e.g.*, Section 338(i) (states that "[t]he Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the purposes of this section"). Relatively less deference is owed to a regulation issued under the general grant of authority contained in Section 7805(a) (*i.e.*, a so-called "interpretative regulation"), than one issued under a specific grant of authority (*i.e.*, a so-called "legislative regulation"). *Vogel*, 455 U.S. at 24,

---

**5.** Treasury Regulation § 1.994–1(e)(3)(i) requires that commissions receivable must be paid within sixty days of the close of a DISC's taxable year in order to be treated under the favorable DISC transfer pricing rules. Treasury Regulation § 1.993–2(d)(2) applies the same sixty-day payment requirement as a prerequisite for commissions receivable being treated as qualified export assets. It is only the imposition of the sixty-day payment requirement in Treasury Regulation § 1.993–2(d)(2), by reference to Treasury Regulation § 1.994–1(e)(3)(i), which Gehl challenges as being invalid. Hence there is really only a single Treasury regulation which is being challenged by Gehl.

**6.** Although Section 7805(a) grants power to the Secretary of the Treasury to "prescribe all needful rules and regulations," the Secretary has delegated this power to the Commissioner, subject to the approval of the Secretary. The same is true of Section 7805(b) which grants power to the Secretary to limit the retroactive effect of a ruling or regulation. Treas.Regs. §§ 301.7805–1(a), 301.7805–1(b). See generally Bittker, FEDERAL TAXATION OF INCOME, ESTATES, AND GIFTS ¶ 110.4.1 (1981). We therefore speak in terms of the Commissioner's powers when analyzing these Sections, while recognizing that "formal authority in this area is divided between the Commissioner and the Secretary." Bittker ¶ 110.4.1.

102 S.Ct. at 827; *Rowan,* 452 U.S. at 253, 101 S.Ct. at 2292. Cf. Bittker, Federal Taxation Of Income, Estates, And Gifts ¶ 110.4.1 (1981) ("in practice the distinction between legislative and interpretative regulations is often blurred, and the supposedly diverse standards of judicial review tend to converge and even to coalesce"). An interpretative regulation is to be upheld as a reasonable interpretation of the congressional mandate so long as it harmonizes with the statute's language, origin, and purpose, *Vogel,* 455 U.S. at 26, 102 S.Ct. at 828; *Rowan,* 452 U.S. at 253, 101 S.Ct. at 2292; *National Muffler,* 440 U.S. at 477, 99 S.Ct. at 1037, while a court's main focus in examining a legislative regulation issued under a specific statutory authority "is whether the interpretation or method is within the delegation of authority." *Rowan,* 452 U.S. at 253, 101 S.Ct. at 2292. A regulation is not inharmonious with a statute's language "simply because the statutory language will support a contrary interpretation." *Vogel,* 455 U.S. at 26, 102 S.Ct. at 828.

The source of the authority for the regulation challenged in the instant case is not clear.[7] Section 994(b) does give specific authority to promulgate regulations setting forth "rules which are consistent with the rules set forth in subsection (a) [inter-company pricing rules] for the application of this section in the case of commissions, rentals, and other income...." The Committee Reports explain this provision as follows:

> [T]he Secretary of the Treasury may prescribe by regulations intercompany pricing rules, consistent with those provided by the bill, in the case of export transactions where the DISC does not take title to the property, but instead, acts as a commission agent for the sale, or is a lessee of the property which it then subleases to its customers.

S.Rep. No. 437 at 108, 1971 U.S.Code Cong. & Ad.News at 1825, 2014; H.R.Rep. No. 533 at 75, 1971 U.S.Code Cong. & Ad.News at 1888.

As noted above, rules governing payments in a Section 994 transaction as well as the rules on producer's loans further the goal that there is to be a tax deferral only on those earnings which are reinvested in the exporting business, and are not "unduly diverted from exporting." *LeCroy Research Systems Corp. v. Commissioner,* 751 F.2d 123, 124, 125 (2d Cir.1984). Since Treasury Regulation § 1.993–2(d)(2) furthers the same goal, one might conclude that this regulation was issued under this specific statutory grant of authority contained in Section 994(b), and the Second Circuit has in fact reached this conclusion. *LeCroy,* 751 F.2d at 126. On the other hand, this statutory grant of authority seems to be confined by its terms to Section 994(b), whereas the interpretation of "accounts receivable" which forms the kernel of the current dispute is covered by Section 993. Relying on this latter reasoning, both the Eleventh Circuit and the Federal Circuit have rejected the contention that the challenged regulations were issued pursuant to the specific statutory grant of authority contained in Section 994(b). *Thomas International Ltd. v. United States,* 773 F.2d 300, 303 (Fed.Cir.1985), certiorari denied, —— U.S. ——, 106 S.Ct. 1261, 89 L.Ed.2d 571; *CWT Farms, Inc. v. Commissioner,* 755 F.2d 790, 801 (11th Cir. 1985). Gehl argues for the position adopted by the Eleventh and Federal Circuits, whereas the Commissioner claims that the challenged regulation is valid in this case regardless of the source of its authority. We agree with the Commissioner that the outcome of our analysis in this particular case is not affected by the source of the regulation's authority. We therefore assume, without deciding, that the challenged regulation was issued pur-

---

**7.** Gehl acknowledges that Treasury Regulation § 1.994–1(e)(3)(i) was promulgated under the specific statutory grant of Section 994(b). At issue is whether Section 994(b) also gives authority for the application of the same sixty-day payment requirement in Treasury Regulation § 1.993–2(d)(2), by reference to Treasury Regulation § 1.994–1(e)(3)(i), for purposes of determining whether commissions receivable are qualified export assets under Section 993(b)(3).

suant to the general grant of authority contained in Section 7805(a), and apply that relatively less deferential standard.

A second refinement of the general deferential standard employed in analyzing the validity of Treasury Regulations concerns the term which the regulation interprets. Where the term that the regulation purports to interpret has already been specifically defined by Congress, the Commissioner's authority to promulgate the regulation is relatively more circumscribed than if the term used is a general one that was not further defined by Congress. *Vogel*, 455 U.S. at 24, 102 S.Ct. at 827.

■ Applying the above standards, and again assuming without deciding that the challenged regulation is an interpretative regulation issued under the general grant of authority contained in Section 7805(a), the regulation is valid for several reasons. First, the term "accounts receivable" neither unambiguously includes commissions receivable nor was specifically defined by Congress to include commissions receivable. The term accounts receivable normally refers to an amount that is due in return for goods or services supplied. By contrast, commissions owed to a commission-agent DISC are not due in return for any services provided by the DISC, but instead merely represent "a method Congress sanctioned to enable domestic corporations to shield from immediate taxation a portion of their income derived from export activities." 773 F.2d at 304. As noted above, this fact allows the Commissioner relatively more freedom to define and apply the term accounts receivable, which he did in Treasury Regulation § 1.993–2(d)(2).

Second, the challenged regulation furthers the same statutory purpose served by the rules on producer's loans and the rules governing the initial payment of the transfer price or commission in Section 994 transactions: to assure that a DISC's tax-deferred profits are not unduly diverted away from exporting activities, thereby preserving the integrity of the DISC provisions. *LeCroy*, 751 F.2d at 125–126. See *supra* pp. 1326, 1329–1330. When a com-

mission is owed by a related supplier of the DISC (Gehl) to the DISC (International), the related supplier effectively has the use of the DISC's income. An open-ended payment period would in effect allow the related supplier to have the indefinite use of the DISC's income for whatever purposes it chooses, and at the same time enable the DISC to include the commission receivables as a qualified export asset for purposes of qualifying as a DISC. The regulatory requirement that commissions owed by a related supplier be paid within sixty days of the close of the taxable year is necessary to prevent this circumvention of the producer's loan provisions and to assure that the DISC's tax-deferred profits are used for exporting activities. For these reasons, the challenged regulation is in harmony with the statute's origin and purpose. All three circuits that have faced this question have agreed with this analysis and have upheld this regulation. *Thomas*, 773 F.2d at 304; *CWT Farms*, 755 F.2d at 801; *LeCroy*, 751 F.2d at 125–126.

Gehl contends that this emphasis on safeguarding the producer's loan provisions and the general concern of a related supplier using the tax-deferred profits of a DISC is unwarranted. Specifically, Gehl argues that since the Commissioner allows a DISC to purchase a related supplier's accounts receivable, which provides an alternate method in addition to producer's loans for the DISC to obtain available cash to its related supplier, we should not be concerned with the fact that open-ended commissions owed from the related supplier to the DISC constitutes yet a third method. However, these two methods should not be viewed as equivalent. When the DISC purchases an account receivable of a related supplier, it is purchasing a receivable owed to the related supplier by a third party, see *DISC—A Panel Discussion Sponsored by the Section of Taxation—Midwinter Meeting—Colorado Springs*, January 28, 1973, 26 Tax.Lawyer 537, 547 (1973), whereas the open-ended unpaid commission owed by the related supplier to the DISC represents a no-strings loan by the DISC to the related

supplier. While admittedly these two methods are similar, to regulate only the "commissions method" is not sufficiently arbitrary or irrational to render the regulation invalid.

Gehl further contends that even if the challenged regulation is valid, there was substantial compliance with it, and that this should be sufficient to satisfy the regulation since in its view the regulation is merely procedural or directory. We disagree. While conceivably the Commissioner could have adopted a generalized standard to address the concerns which possibly would have required only substantial compliance, *Tipps v. Commissioner*, 74 T.C. 458, 468 (1980), he did not do so. Instead, he adopted a specific timing rule, perhaps prophylactic, but most assuredly unequivocal. A regulation of this type must be strictly complied with. *Thomas*, 773 F.2d at 305; *Tipps*, 74 T.C. at 468; *Fritzche Dodge & Olcott, Inc. v. Commissioner*, 45 TCM (CCH) 607, 609–610 (1983). Parenthetically it should be noted that the challenged regulation hardly constitutes a rigid straitjacket, since the timing rule is satisfied even if only a "reasonable estimate" of the actual commissions due is paid within sixty days, Treas.Reg. § 1.994–1(e)(3)(i), and a fifty percent payment is "deemed" to be a reasonable estimate of such commissions, Treas.Reg. § 1.994–1(e)(3)(iv), *Thomas*, 773 F.2d at 305; see also W.A. Slowinski, *Some Practical Applications of the New DISC Provisions (Part II)*, 3 Tax Advisor 650, 653 (1972).

## IV

Even assuming that the regulation is valid and International did not satisfy it, Gehl argues that it should not be applied retroactively. The regulation at issue, although proposed on October 4, 1972, was not adopted until October 14, 1977. If Gehl's contention is correct, then International would still qualify as a DISC for its taxable years ended January 31 of 1976 and 1977. Before reaching the merits of this argument, however, a threshold issue must be faced: the failure of Gehl to raise this retroactivity argument in the Tax Court.

As a general rule, an argument that is not raised below cannot be raised for the first time by an appellant in a court of appeals. *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826; *National Metalcrafters v. McNeil*, 784 F.2d 817, 825 (7th Cir.1986); *Mattingly v. Heckler*, 784 F.2d 258, 261 n. 2 (7th Cir. 1986); *Erff v. Markhon Industries, Inc.*, 781 F.2d 613, 618 (7th Cir.1986). However, like many general rules, this rule has its exceptions. *Singleton*, 428 U.S. at 120–121, 96 S.Ct. at 2877; *National Metalcrafters*, 784 F.2d at 825. We do retain discretion to entertain in certain situations an issue on appeal that was not raised below. *Singleton*, 428 U.S. at 121, 96 S.Ct. at 2877; *Sgro v. United States*, 609 F.2d 1259, 1264 n. 8 (7th Cir.1979). In particular, where the issue does not require a new factual record, *Commissioner v. Gordon*, 391 U.S. 83, 95 n. 8, 88 S.Ct. 1517, 1524 n. 8, 20 L.Ed.2d 448; *National Metalcrafters*, 784 F.2d at 826; *Sgro*, 609 F.2d at 1264 n. 8, and where there has been a change in the views of existing law that occurred after the decision below but prior to the appeal, *Hormel v. Helvering*, 312 U.S. 552, 558–559, 61 S.Ct. 719, 722, 85 L.Ed. 1037, a court of appeals has the discretion to hear the issue on appeal. In view of the nature of the issue raised by Gehl and the timing of the Second Circuit's decision in *LeCroy* (the *LeCroy* decision was announced December 20, 1984, whereas the decision below was filed December 27, 1984, and Gehl's answering brief was filed March 8, 1984), we will reach the merits of the retroactivity issue.

Section 7805(b) gives the Commissioner the power to "prescribe the extent, if any, to which any ruling or regulation ... shall be applied without retroactive effect," and thus establishes a presumption that regulations are to be applied retroactively. *CWT Farms*, 755 F.2d at 802; *LeCroy*, 751 F.2d at 126; *Redhouse v. Commissioner*, 728 F.2d 1249, 1251 (9th Cir.1984), certiorari denied, — U.S. —, 105 S.Ct. 506, 83 L.Ed.2d 397; *Wilson v. United States*, 588

F.2d 1168, 1171 (6th Cir.1978); *Anderson, Clayton & Co. v. United States*, 562 F.2d 972 (5th Cir.1977), certiorari denied, 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785; *Chock Full O'Nuts Corp. v. United States*, 453 F.2d 300, 302 (2d Cir.1971). See also *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180, 183–188, 77 S.Ct. 707, 709–712, 1 L.Ed.2d 746,[8] *Wisconsin Nipple & Fabricating Corp. v. Commissioner*, 581 F.2d 1235, 1237 (7th Cir. 1978) (both cases apply the presumption of retroactivity in Section 7805(b) to a ruling by the Commissioner).[9] We can, however, review under an abuse of discretion standard the Commissioner's decision under Section 7805(b) not to limit the retroactive effect of a regulation. *CWT Farms*, 755 F.2d at 802; *LeCroy*, 751 F.2d at 127; *Wendland v. Commissioner*, 739 F.2d 580, 581; *Redhouse*, 728 F.2d at 1251; *Wilson*, 588 F.2d at 1172; *Anderson, Clayton*, 562 F.2d at 979; *Kahler Corp. v. Commissioner*, 486 F.2d 1, 5 (8th Cir.1973); *Chock Full O'Nuts*, 453 F.2d at 302. Relevant considerations include whether or to what extent the taxpayer justifiably relied on the prior settled law that is altered by the regulation, and whether retroactive application of the regulation would create an inordinately harsh result. *CWT Farms*, 755 F.2d at 802; *Anderson, Clayton*, 562 F.2d at 981.

The critical piece of evidence advanced by Gehl to support its contention that the challenged regulation should not have retroactive effect is a Treasury Pamphlet issued in January 1972 (shortly after the DISC provisions were enacted) entitled *Handbook for Exporters*. 1972–1 C.B. 679. The *Handbook* contained an opening section which gave a broad overview of DISCs, a second section which posed and answered basic questions about DISCs, and a third section which explained the DISC provisions in some detail. The *Handbook* explicitly said that a DISC can act as a commission agent, 1972–1 C.B. 681, and provided that accounts receivable which arose in connection with a DISC's qualified export sales transactions are qualified export assets, whether the DISC acted as principal or agent, 1972–1 C.B. 685. No limitations were set forth as to how promptly such commissions had to be paid. The challenged regulation, with its time limitations, thus represents a quite significant, and for Gehl extremely detri-

---

**8.** Although *Automobile Club of Michigan* was decided under Section 3791(b) of the 1939 Code, that Section was, for our purposes, identical in legal effect to Section 7805(b) of the 1954 Code.

**9.** Neither Congress nor the courts have generally held that there is a distinction between an interpretative regulation and a legislative regulation as regards their retroactivity. *Anderson, Clayton*, 562 F.2d at 984. However, some courts have spoken on this issue. In *Wisconsin Nipple*, we noted that the Code's presumption of retroactivity lies in the declaratory theory of jurisprudence which states that an interpretative regulation merely declares what the statute meant all along. *Wisconsin Nipple*, 581 F.2d at 1237. See also Comment, *Limits on Retroactive Decision Making by the Internal Revenue Service: Redefining Abuse of Discretion Under Section 7805(b)*, 23 U.C.L.A. L.Rev. 529, 532 (1976). We parenthetically note that *Wisconsin Nipple* involved the retroactive effect of a ruling, not a regulation. The Fifth Circuit noted this declarative theory in *Anderson, Clayton*, but proceeded to discredit it for purposes of determining whether a regulation can be applied retroactively. *Anderson, Clayton*, 562 F.2d at 984–985, 985 n. 30. The Fifth Circuit said that "[f]or purposes of determining retroactivity, the emphasis should be not whether a regulation more closely resembles the legislative or interpretative ideal type, but how the new regulation stands in relation to prior law or policy." *Id.* See also *Wilson*, 588 F.2d at 1171 n. 11 (discusses both *Anderson, Clayton* and *Wisconsin Nipple*).

Whether or not our retroactivity analysis would be affected by the interpretative or legislative nature of a challenged regulation, however, is not before us today. Although an argument can be made that Treasury Regulation § 1.993–2(d)(2) was issued pursuant to the specific statutory grant of authority of Section 994(b) and hence is legislative in character, and the Commissioner weakly raised this argument for purposes of the applicable legal standard for upholding the validity of the challenged regulation, see *supra* pp. 1329–1330, the Commissioner never raised this distinction for purposes of retroactivity analysis. We therefore continue to assume that the challenged regulation was issued pursuant to Section 7805(a) (*i.e.*, an interpretative regulation), without deciding how the standard presumption of retroactivity and our resulting analysis would be altered, if at all, if the regulation were legislative in nature.

mental, change from the positions stated in the *Handbook*.

■ The above, without more, would most likely not be enough for Gehl to claim that the Secretary abused his discretion in giving retroactive effect to Treasury Regulation § 1.993–2(d)(2). *LeCroy*, 751 F.2d at 126. The reason for this conclusion is that, as a general rule, informal Treasury publications and pamphlets such as the *Handbook* do not bind the government. They are simply guides, and a taxpayer who relies on them generally does so at his own peril. *Caterpillar Tractor Co. v. United States*, 589 F.2d 1040, 1043 (Ct.Cl.1978); *Carpenter v. United States*, 495 F.2d 175, 184 (5th Cir.1974); *Adler v. Commissioner*, 330 F.2d 91, 93 (9th Cir.1964); *Hames v. Commissioner*, 46 TCM (CCH) 1236 (1983).

■ However, this *Handbook* did more than merely state the then current understanding of the DISC provisions. The *Handbook* specifically promised that the "Service will follow the rules and procedures set forth in this part[10] until such time as they may be modified in regulations or Treasury publications," and that "[a]ny such modifications which may be adverse to taxpayers will apply prospectively only." 1972–1 C.B. 682. In view of this promise, we agree with the Second Circuit that the Commissioner abused his discretion in giving retroactive effect to Treasury Regulation § 1.993–2(d)(2), for several reasons. *LeCroy*, 751 F.2d at 126–128.

First, this special statement on retroactivity contained in the *Handbook* differentiates it from the standard Treasury publication. This is more than an interpretation of existing law; it is an express promise that the Commissioner will not in the future exercise his discretion to apply adverse changes retroactively. This is a specific statement designed to elicit reliance on the part of taxpayers, as opposed to a typical publication which may well say nothing on the issue of the retroactivity of future changes. While silence on this subject may fairly be viewed as implicitly saying "beware to those who rely on this publication; you do so at your own peril," an express promise cannot fairly be construed in this fashion. *LeCroy*, 751 F.2d at 126, 127.

Second, the nature of the DISC provisions underscores the reliance that this express promise was designed to evoke. The DISC provisions are nothing more than an export tax subsidy designed to alter business behavior and encourage domestic businesses to devote more resources to the export of American-made goods. *LeCroy*, 751 F.2d at 127. Since the Treasury's express promise of prospective treatment for any changes adverse to taxpayers undoubtedly increased both the probability that a corporation would qualify for DISC treatment and the value of qualifying for DISC treatment, and therefore increased the desirability of electing DISC treatment, the promise was crucial in helping the DISC provisions meet their goal of altering business behavior in favor of export activities. Not only did this promise reasonably induce reliance; the promise was originally made specifically to create such reliance. To allow the Treasury to renege on such express promises with impunity is grossly unfair. As the Second Circuit aptly noted, "the retroactive applications of regulations in the face of a promise of prospectivity smells of a bushwack." *LeCroy*, 751 F.2d at 128.

Third, to hold otherwise would not only defeat Gehl's valid expectations in the in-

---

**10.** The phrase "in this part" refers to Part III of the *Handbook* which explains the DISC provisions in detail. Included in Part III is an explanation that accounts receivable which arise in connection with a DISC's qualified export sale transactions are qualified export assets, regardless of whether the DISC acts as a principal or agent. 1972–1 C.B. 685. Thus, even if the quoted phrase means that the promise of prospective effect applies only to those statements made in Part III of the *Handbook*, Gehl can still make the argument that this promise applies to Treasury Regulation § 1.993–2(d)(2), and therefore the problem noted by the court in *Caterpillar* does not arise in the instant case. *Caterpillar*, 589 F.2d at 1043 (no statement made in Part III regarding the challenged regulation in that case, therefore court never reached the issue of how this express promise might alter the normal presumption of retroactivity).

stant case, but would also blunt the effectiveness of other, future statutes which also serve to alter taxpayers' behavior. *LeCroy,* 751 F.2d at 128. If a taxpayer knows that the Treasury's promise that a new Code provision designed to encourage certain behavior will not be adversely altered retroactively is an illusory promise, that taxpayer will surely be less likely to alter his behavior in the manner hoped for by Congress when it passed the particular provision. Future attempts to reduce the cost of uncertainty for taxpayers will prove ineffective at best.

We acknowledge the Eleventh Circuit's contrary view on the retroactivity of Treasury Regulation § 1.993–2(d)(2) in *CWT Farms.* However, that court relied at least in part on the general rule that the government is not bound by statements in informal Treasury publications and pamphlets. *CWT Farms,* 755 F.2d at 804. As stated above, this rule is supportable as a general matter. In the instant case, however, the extraordinary express promise of prospective treatment contained in the *Handbook* warrants a different conclusion.

For the above stated reasons, we uphold the validity of Treasury Regulation § 1.993–2(d)(2), but deem it an abuse of discretion to apply it retroactively. Accordingly, the Commissioner's deficiency determinations applicable to Gehl for International's taxable years ended January 31 of 1976 and 1977 must be set aside. In other respects the decision of the Tax Court is affirmed.