**ARCHER–DANIELS–MIDLAND COMPANY, et al.,**
Plaintiffs,

v.

**UNITED STATES of America,**
Defendant.

No. 89–2325.

United States District Court,
C.D. Illinois,
Danville Division.

Sept. 8, 1992.

506

David J. Smith, Archer–Daniels–Midland Co., Decatur, Ill., Felix B. Laughlin, David E. Watts, Joseph Angland, Dewey Ballantine Bushby Palmer & Wood, New York City, James E. Peckert, A. James Shafter, Kehart Shafter Hughes & Webber, P.C., Decatur, Ill., for plaintiffs.

Frances Hulin, Asst. U.S. Atty., Danville, Ill., Donald J. Gavin, Steven E. Cole, U.S. Dept. of Justice, Tax Div., Washington, D.C., for the U.S.

## ORDER

BAKER, District Judge.

■ Archer–Daniels–Midland Company (ADM) brought this action against the United States of America on behalf of itself and as the common parent of an affiliated group of corporations. ADM is seeking a refund of federal taxes along with interest paid to the United States for the tax years 1975 through 1978. The parties have filed cross motions for partial summary judgment. (docket # 17 and 19) The only issue involved in these motions is whether Treas. Reg. § 1.994–1(e)(1)(i), 26 C.F.R. § 1.994–1(e)(1)(i), which limits the use of two methods for determining the taxable income of a domestic international sales corporation (DISC), is valid.[1] For the reasons set forth below, the court agrees with the plaintiffs that Treas.Reg. § 1.994–1(e)(1)(i) is invalid.

## I. INTERNAL REVENUE CODE SECTION AND TREASURY REGULATION

Congress enacted the DISC provisions, 26 U.S.C. §§ 991–997,[2] as a part of the Revenue Act of 1971. The purpose of the provisions "was to provide tax incentives for United States firms to increase their exports and to remove the previous tax disadvantage of firms engaged in export activities through domestic corporations instead of through foreign subsidiaries." *Thomas International, Ltd. v. United States*, 773 F.2d 300, 301 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1045, 106 S.Ct. 1261, 89 L.Ed.2d 571 (1986); *LeCroy Research Sys. Corp. v. Commissioner*, 751 F.2d 123, 124 (2d Cir.1984). These provisions authorize the exporters to establish DISCs as

---

1. The remaining issue in the case concerns the taxation of insurance transactions involving ADM's two wholly-owned foreign subsidiaries engaged in the insurance business.

2. All statutory references in this order are to sections of the Internal Revenue Code of 1954 (26 U.S.C.).

separate subsidiaries to handle foreign sales and leases. The basic function of a DISC, under section 993, "is the selling or leasing of export property which has been created by someone else in the United States for ultimate use outside the United States." *Gehl Co. v. Commissioner*, 795 F.2d 1324, 1326 (7th Cir.1986) (quoting Bittker & Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶ 17.14.2 (4th ed. 1979)). In essence, a DISC may be only a shell corporation whose sole function is to receive income from foreign sales by the parent corporation. *Thomas International*, 773 F.2d at 301; *see Dresser Indus. v. Commissioner*, 911 F.2d 1128, 1131 (5th Cir.1990) ("Typically, a DISC is a paper company without facilities, employees, or inventory of its own.").

The tax advantages of the DISC provisions stem from the fact that a DISC is not subject to federal income tax on its income from export sales. *Durbin Paper Stock Co. v. Commissioner*, 80 T.C. 252, 254 (1983). Instead, approximately one-half of the DISC's earnings is taxed to its shareholders as constructive dividends. The remainder of the earnings is not taxed until actually distributed to the shareholders. *See Gehl*, 795 F.2d at 1327; *Thomas International*, 773 F.2d at 301; *LeCroy*, 751 F.2d at 124. However, the statute provides that the exempted earnings must be used in export activities and not diverted to production for the domestic market or to production overseas. To fulfill the purposes of the DISC provisions, the DISC scheme includes strict requirements for qualification as a DISC and provisions regulating "transactions and transfers involving the flow of the DISC's tax-deferred profits to related entities." *Gehl*, 795 F.2d at 1326.

The DISC can participate in export transactions in two different ways. In each type of transaction, the DISC deals with a "related supplier"[3] in the sale of export property[4] to a third party. In the first type of transaction, the DISC operates as a principal in the resale of export property that the DISC purchased from the related supplier. Here the DISC earns income on the resale which the related supplier would otherwise have earned. In the second type of transaction, the DISC acts as a commission agent facilitating the sale of export property directly from the related supplier to the third party. The DISC's earnings in this transaction include commissions which the related supplier can deduct as commission expenses to reduce taxable income.

One provision that regulates the flow of the DISC's profits to related entities is section 994. This section sets forth intercompany pricing rules used to determine the DISC's taxable income. As established in this section, DISC taxable income is "based on a ... 'deemed' transfer price for export goods provided to the DISC by its parent or related supplier." *Dresser*, 911 F.2d at 1131. The statute includes three alternative formulas for determining the "deemed transfer price." *Id.* Section 994(a) states:

> In the case of a sale of export property to a DISC by a [related supplier], the taxable income of such DISC and such person shall be based upon a transfer price which would allow such DISC to derive taxable income attributable to such sale (regardless of the sales price actually charged) in an amount which does not exceed the greatest of—
>
> (1) 4 percent of the qualified export receipts on the sale of such property by the DISC plus 10 percent of the export promotion expenses of such DISC attributable to such receipts,
>
> (2) 50 percent of the combined taxable income of such DISC and [the related supplier] which is attributable to the qualified export receipts on such property derived as the result of a sale by the DISC plus 10 percent of the export pro-

---

**3.** A "related supplier" is a related party as defined in 26 U.S.C. § 482 that engages in a transaction with the DISC under the rules of 26 U.S.C. § 994. In this case, ADM and its affiliated corporations acted as the related suppliers for their DISC, Ardanco, Inc., a wholly-owned DISC of ADM.

**4.** For the purposes of the DISC provisions, export property is defined in 26 U.S.C. § 993(c).

motion expenses of such DISC attributable to such receipts, or

(3) taxable income based upon the sale price actually charged (but subject to the rules provided in section 482).

26 U.S.C. § 994(a). The three alternative inter-company pricing methods for computing the taxable income from the export sales are known as the 4 percent gross receipts method, the combined taxable income method, and the section 482 method.[5]

Although section 994(a) specifically applies only to transactions in which the DISC acts as a principal, section 994(b) directs the Secretary to prescribe rules to apply when the DISC acts as a commission agent.[6] The rules are found in inter-company pricing rules for DISCs, 26 C.F.R. § 1.994–1(d) (1991). These rules apply the 4 percent gross receipts method (called simply the "gross receipts method" in the regulations) and the combined taxable income method in sections 994(a)(1) and (2) to commissions.

The Secretary also has issued regulations concerning the application of the three pricing methods. Treasury Reg. 1.994–1(e)(1)(i) limits the situations in which the 4 percent gross receipts method and the combined taxable income method may be applied. The regulation provides:

(e) Methods of applying paragraphs (c) and (d) of this section—(1) Limitation on DISC income ("no loss" rule)—(i) In general. Except as otherwise provided in this subparagraph, neither the gross receipts method nor the combined taxable income method may be applied to cause in any taxable year a loss to the related supplier, but either method may be applied to the extent it does not cause a loss. A loss to a related supplier would result if the taxable income of the DISC

would exceed the combined taxable income of the related supplier and the DISC. If, however, there is no combined taxable income of the DISC and the related supplier (because, for example, a combined loss is incurred), a transfer price (or commission) will not be deemed to cause a loss to the related supplier if it allows the DISC to recover an amount not in excess of its costs (if any).

26 C.F.R. § 1.994–1(e)(1)(i) (1991). Under this regulation, also called the no-loss rule, a party, such as ADM, cannot use the 4 percent gross receipts method if the application of that method would result in a loss for the related supplier. ADM challenges the validity of this regulation.

## II. FACTS

Since the parties have agreed to the facts surrounding the transactions and have submitted a stipulation stating the facts (docket # 18), the court will review the facts briefly. In March, 1972, ADM incorporated a wholly-owned subsidiary, Ardanco, Inc. (Ardanco), to act as a DISC of ADM within the meaning of Section 992(a). Stipulation para. 10. During the tax years 1975 through 1978, Ardanco received commissions and transfer price income from transactions with its related suppliers, ADM, ADM Milling Company, ADM Export Company, Ross & Rowe, Inc., and Tabor & Company. Stipulation ¶¶ 21–22. In each of those years, transactions involving Ardanco and its related suppliers were subject to suppliers' agreements that provided that "the transfer price paid ... by Ardanco ... or the commission ... payable to Ardanco ... will be established in accordance with a formula which will entitle Ardanco to derive the maximum taxable income from such sales which may be allo-

---

**5.** The government explains that this third method was the traditional arm's-length method used to determine taxable income and the first two methods are the special ones created to promote exports by U.S. companies. *See* Government's Memo in Support of Summary Judgment at 8. (Government's First Memo at 8) (docket # 20).

**6.** Section 994(b) provides:
The Secretary shall prescribe regulations setting forth—

(1) rules which are consistent with the rules set forth in this subsection (a) for the application of this section in the case of commissions, rentals, and other income, and

(2) rules for the allocation of expenditures in computing combined taxable income under subsection (a)(2) in those cases where a DISC is seeking to establish or maintain a market for export property.

cated to it under the intercompany pricing rules as set forth in section 994 of the Internal Revenue Code." Stipulation ¶ 21. ADM established intercompany accounts payable and accounts receivable based upon the pricing methods in section 994(a) and, in its tax returns, computed its commissions and transfer prices applying the no-loss limitation. Stipulation ¶¶ 22–23.

ADM now argues, as it did in protests and refund claims filed for the years 1975 through 1978, that the no-loss rule is contrary to the 4 percent gross receipts method in section 994(a)(1) and is invalid. Stipulation ¶ 24. Without the no-loss limitation, ADM's taxable income would decrease and Ardanco's taxable income would increase. ADM seeks a refund based on the calculation of its taxes under the 4 percent gross receipts method, without the limitation of the no-loss rule.

### III. DISCUSSION

Summary judgment is appropriate on the issue of the validity of the no-loss regulation since no material facts exist concerning this issue. The court's role in determining the validity of a Treasury regulation is limited. *Gehl*, 795 F.2d at 1328. Ordinarily, a court should defer to the regulation if the court concludes that "the regulation 'implement[s] the congressional mandate in some reasonable manner.'" *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 24, 102 S.Ct. 821, 827, 70 L.Ed.2d 792 (1982) (quoting *United States v. Correll*, 389 U.S. 299, 307, 88 S.Ct. 445, 450, 19 L.Ed.2d 537 (1967)); *Gehl*, 795 F.2d at 1328 (listing citations); *see American Medical Assoc. v. United States*, 887 F.2d 760, 770 (7th Cir.1989) ("Treasury regulations 'must be sustained unless unreasonable and plainly inconsistent with the revenue statutes'"). "But this general deferential standard is only the beginning of the necessary analysis. This standard is further refined by the source of authority under which the challenged regulation was issued." *Gehl*, 795 F.2d at 1328 (citations omitted).

■ The Commissioner may issue a regulation under the general grant of authority to "prescribe all needful rules and regulations," section 7805(a), or under a specific statutory grant of authority. *Gehl*, 795 F.2d at 1328. A court owes less deference to a regulation issued under section 7805(a)'s general grant of authority, an interpretative regulation, than to a regulation issued under a specific grant of authority, a legislative regulation. *Rowan Cos. v. United States*, 452 U.S. 247, 253, 101 S.Ct. 2288, 2292, 68 L.Ed.2d 814 (1981); *Gehl*, 795 F.2d at 1328. When reviewing a legislative regulation, a court's inquiry is limited to "whether the interpretation or method is within the delegation of authority." *Rowan*, 452 U.S. at 253, 101 S.Ct. at 2292. Legislative regulations are controlling "unless they are arbitrary, capricious, or manifestly contrary to the statute." *Dresser*, 911 F.2d at 1137 (citations omitted). A court will uphold an interpretative regulation as a reasonable interpretation of the congressional mandate only if it harmonizes with the statute's language, origin, and purpose. *Vogel*, 455 U.S. at 25, 102 S.Ct. at 827; *National Muffler Dealers Ass'n v. United States*, 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979). But the court must "scrutinize a regulation's fidelity to the overall statutory framework and legislative history." *Water Quality Ass'n Employees' Benefit Corp. v. United States*, 795 F.2d 1303, 1305–06 (7th Cir.1986) (when appropriate, court may substitute its judgment for an agency's when the regulation is interpretative). Thus, the weight that the court will accord to the regulation depends on the regulation's source of authority. *Dresser*, 911 F.2d at 1137.

### A. *Source of Authority*

■ The source of the authority for Treas.Reg. § 1.994–(e)(1)(i) is not clear. The government argues that the no-loss rule is valid either as a legislative regulation authorized by section 994(b)(1) or as an interpretative regulation. To support its assertion that the no-loss rule is a legislative regulation, the government explains that the three inter-company pricing methods in section 994(a) literally apply only to

a DISC operating on a buy-sell basis. When a DISC, like Ardanco, also acts as a commission agent, it must look to the regulations promulgated under section 994(b)(1) to obtain the DISC tax benefits. Treasury Reg. § 1.994–1(d)(2) allows commission DISCs to use the 4 percent gross receipts method.

> The challenged "no-loss" rule is located in the next subparagraph (e) of the regulation, which sets forth the "methods of applying paragraphs (c) and (d) of this section." Accordingly, it is apparent that the "no-loss" rule is part of an integral set of regulatory provisions authorized by I.R.C. Section 994(b)(1) for establishing the parameters of the intercompany pricing methods for a commission DISC situation.

Government's Second Memo at 6. (docket # 26)

ADM argues that the regulation is interpretative because neither section 994 nor any other DISC provision in the code gives the Treasury Department the regulatory authority to limit the 4 percent method. Specifically, ADM asserts that the only statutory grant of authority relating to the inter-company pricing rules is found in section 994(b)(1) and (2). The grant of authority in section 994(b)(1) does not encompass the authority to promulgate the no-loss rule, ADM contends, because this section provides only for the extension of the three pricing methods in section 994(a) to DISC commission transactions. Section 994(b)(1) directs the Secretary to issue regulations that set forth "rules which are consistent with the rules set forth in subsection (a) for the application of this section in the case of commissions, rentals, and other income." The inclusion of the words "consistent with" indicates that section 994(b)(1) does not authorize the Secretary to promulgate regulations, such as the no-loss rule, which limit the inter-company pricing methods. In addition, the no-loss rule applies to commission DISCs and to DISCs acting as the principal in a transaction. The grant of authority in section 994(b)(2) is also irrelevant here, according to ADM, because it deals only with the combined taxable income method. ADM also points to the Treasury Decision issuing the rules that states the decision is issued under the authority of section 7805. T.D. 7364, 1975–2 C.B. 315, 328.

Although no court has determined whether the no-loss rule is a legislative or interpretative regulation, several courts have discussed section 994(b)(1)'s grant of authority in relation to other DISC regulations. In *Gehl*, the Seventh Circuit discussed whether section 994(b)(1) authorized the Secretary to promulgate Treas.Reg. § 1.993–2(d)(2). The Court quoted the Committee Reports explaining the grant of authority in section 994(b)(1):

> [T]he Secretary of the Treasury may prescribe by regulations intercompany pricing rules, consistent with those provided by the bill, in the case of export transactions where the DISC does not take title to the property, but instead, acts as a commission agent for the sale, or is a lessee of the property which it then subleases to its customers.

*Gehl*, 795 F.2d at 1329 (quoting S.Rep. No. 437, 92d Cong., 1st Sess. 108 (1971), *reprinted in* 1971 U.S.C.C.A.N. 1825, 1918, 2014; H.R.Rep. No. 533, 92d Cong., 1st Sess. 75 (1971), *reprinted in* 1971 U.S.C.C.A.N. 1825, 1888).[7] Another court explained the grant of authority in section 994(b)(1) as "expressly delegat[ing] to the Commissioner the authority to issue regulations regarding the amount of commissions to be charged in transactions between related persons." *CWT Farms, Inc. v. Commissioner*, 79 T.C. 1054, 1066 (1982), *aff'd*, 755 F.2d 790 (11th Cir.1985), *cert. denied*, 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986).

In *Dresser*, the Fifth Circuit analyzed the source of authority of Treas.Reg. § 1.994–1(c)(6)(v). Just as in this case, the Treasury Decision promulgating the regulation

---

**7.** Because the *Gehl* court agreed with the Commissioner that the source of the regulation's authority did not affect the outcome of the analysis in that case, the court assumed, without deciding, that the challenged regulation was issued under the general grant of authority in section 7805(a) and applied the less deferential standard. 795 F.2d at 1329–30.

at issue in *Dresser* stated that the regulation was issued under the general grant of authority in section 7805(a). However, the court stated that it was "not bound by mere nomenclature used by the issuing agency." 911 F.2d at 1138. Instead, the court found that the proper approach to determining the regulation's source of authority was to examine the statutory language and the regulation itself. *Id.* at 1138–1139. After analyzing the language and the legislative history of section 994(b), the court concluded that "Congress intended the tax treatment of commission DISCs to be consistent with the treatment of buy-sell DISCs. Congress specifically authorized the Secretary to make rules ensuring that consistency." *Id.* at 1139. In finding that Treas.Reg. § 1.994–1(c)(6)(v) is a legislative regulation, the court relied on two facts: (1) the regulation "is directed exclusively to the calculation of deemed intercompany transfer prices in the case of commission DISCs," and, thus, falls within the rulemaking authority granted in section 994(b), and (2) the regulatory provisions which "fall squarely within the specific grant of rulemaking authority set out in code section 994(b)," section 1.994–1(d), incorporate section 1.994–1(c)(6) by reference. *Id.* at 1140.[8]

Following the analysis set forth in *Dresser*, the court concludes that Treas.Reg. § 1.994–1(e)(1)(i) is an interpretative regulation. Section 994(b) authorizes the Secretary to prescribe regulations for determining the deemed transfer price in transactions involving commission DISCs and to ensure consistency in the treatment of commission and buy-sell DISCs. The no-loss rule exceeds this grant of authority. Although the no-loss rule directly relates to the calculation of the deemed transfer price of export goods under section 994, it applies a limitation to the calculation of the transfer price in transactions involving both commission DISCs and buy-sell DISCs. In addition, the government does

not argue that the no-loss rule furthers the same goal as the rules in section 994 and, thus, must come under the same grant of authority. *See Gehl*, 795 F.2d at 1329 (discussing *LeCroy*).

### B. *The Terms that the Regulation Interprets*

■ After determining the source of authority of a challenged regulation, the general deferential standard used in assessing the validity of a regulation is refined further by focusing on the term that the regulation interprets. *Gehl*, 795 F.2d at 1330. "Where the term that the regulation purports to interpret has already been specifically defined by Congress, the Commissioner's authority to promulgate the regulation is relatively more circumscribed than if the term used is a general one that was not further defined by Congress." *Id.* (citing *Vogel*, 455 U.S. at 24, 102 S.Ct. at 827); *Thomas International*, 773 F.2d at 303. In other words, if the statutory language is unambiguous, the Commissioner has less freedom to define and interpret it. A regulation that contradicts the unambiguous language of the statute or adds a requirement to the statute without a valid reason cannot stand. *CWT Farms*, 79 T.C. at 1062 (citations omitted); *Arrow Fastener Co. v. Commissioner*, 76 T.C. 423, 430 (1981). "Finally, although a regulation does not clearly contradict or limit the provisions of the statute it purports to interpret, it is nonetheless invalid if it is inconsistent with the statute's origin and purpose." *CWT Farms*, 79 T.C. at 1062 (citing *Vogel*, 455 U.S. at 26, 102 S.Ct. at 828).

■ ADM maintains that section 994(a)(1) is unambiguous. The Congressional language in section 994(a), ADM contends, is clear and precise in its creation of a mathematical formula for establishing the taxable income of a DISC. ADM rejects any contention that section 994 is merely a general framework and insists that, if Congress had intended to enable

---

8. In *LeCroy*, the court found that Treas.Reg. § 1.994–1(e)(3) is a legislative regulation since it furthers the same goal as the rules governing payments in a section 994 transaction and prevents the circumvention of other statutory limi-

tations on DISCs. 751 F.2d at 125–26. *But see Thomas International*, 773 F.2d at 303. Like the regulation at issue in *Dresser*, the challenged regulation in *LeCroy* related exclusively to commission DISCs.

the Treasury Department to lower the 4 percent formula in certain situations, Congress would have given the Treasury Department such explicit regulatory power.

The government, on the other hand, argues that section 994(a) does not state a clear mathematical rule. And, according to the government, the Secretary followed the express intent of the Congressional Committees by promulgating the no-loss rule. The government relies on reports of the House Ways and Means Committee, the Senate Finance Committee, and the Joint Committee on Internal Revenue Taxation which include this statement concerning section 994(a)(1) and (2):

> Under the first of the two new rules, a DISC may earn that portion of the combined taxable income arising on the sale by a DISC of export property purchased from a related person which does not exceed 4 percent of the qualified export receipts from the sale, plus 10 percent of the DISC's export promotion expenses attributable to the sale. Income may not, however, be allocated to the DISC under this (or the second) rule to the extent it would result in the related person who sold the products to the DISC incurring a loss on the sale.

H.R.Rep. No. 533, 92d Cong., 1st Sess. 74 (1971), *reprinted in* 1971 U.S.C.C.A.N. 1825, 1887; S.Rep. No. 437, 92d Cong., 1st Sess. 107–108 (1971), *reprinted in* 1971 U.S.C.C.A.N. 1918, 2013; Joint Committee on Taxation, *General Explanation of the Revenue Act of 1971*, at 102 (1972).

To support the no-loss rule as a reasonable interpretation of section 994(a), the government disputes ADM's characterization of section 994(a) as a mathematical formula. To the government, the language of the statute clearly demonstrates that 994(a) is not a mathematical formula and is appropriate for regulatory interpretation. Specifically, the fact that the language in section 994(a) allows the DISC to derive taxable income which *"does not exceed the greatest of"* the three pricing methods indicates that Congress intended to create a general framework which the Secretary would interpret. This language does not

mandate the use of a specific 4 percent mathematical formula at all times; rather, any amount less than the amount calculated under the 4 percent method "does not exceed" the statutory limitation and can be used.

The court finds that the language of section 994(a) is unambiguous. Unlike statutory sections which contain terms that require further definition, such as "accounts receivable," section 994(a) has been specifically defined by Congress. The government's reliance on the phrase "an amount which does not exceed the greatest of" is misplaced. The plain meaning of this phrase when followed by three alternative methods is that the taxpayer can choose one of the three methods, including one that allows the DISC to derive less taxable income than another method. If the government's interpretation of this phrase were correct, the Secretary could promulgate regulations forcing the DISC to receive any amount less than the amount calculated under the three methods. Such a result would contradict the DISC provisions' purpose of encouraging exports. The Secretary cannot add a restriction or limitation to an unambiguous statutory provision. *Durbin Paper*, 80 T.C. at 257; *Arrow Fastener*, 76 T.C. at 431.

Moreover, because the court does not find doubt concerning the meaning of the terms in section 994(a), it will not look to the legislative history to discover a limitation that Congress did not include in the statute. *See In re Sinclair*, 870 F.2d 1340, 1344 (7th Cir.1989) ("Legislative History helps us learn what Congress meant by what it said, but it is not a source of legal rules competing with those found in the U.S. Code."). Although the Committee reports indicate that the provisions do not allow the related supplier to take a loss, the statute, as enacted, does not include this limitation. In addition, the government has not persuaded the court that the no-loss rule is in harmony with the statute's origin and purpose. Unlike the regulation at issue in *Gehl* or *Thomas International*, the government has not argued that this regulation is necessary to prevent circumvention of another statutory section in the

DISC scheme. *See Gehl,* 795 F.2d at 1330; *Thomas International,* 773 F.2d at 304. Finally, the government cannot argue that the goal of encouraging exports through the use of domestic subsidiaries is furthered by this provision.

The government also asserts that sections 994(a)(1) and (2) only address the allocation of taxable income between the DISC and the related supplier, whereas the no-loss rule deals with the export transactions that result in less than zero taxable income for the related supplier.

> Specifically, the no-loss rule addresses the related but distinct issue of whether the related supplier may claim a deduction for a *loss* from the sale of export property which results in taxable income of less that $0 to the related supplier. The no-loss rule does not "modify" or "amend" the statutory provision, which clearly does not address the issue of the allowance of loss deduction.

Government's First Memo at 14. (docket # 20) Moreover, the no-loss rule, according to the government, implements Congressional intent concerning the related supplier's ability to take a loss deduction. See Government's Second Memo at 11–15 for further argument concerning allocation of income under section 994(a). (docket # 26) With this argument, the government appears to be trying to justify the no-loss rule even if section 994(a) is unambiguous.

ADM asserts that the government's attempt to characterize the no-loss rule as dealing with the allowance of deductions misreads section 994(a). Using ADM's reasoning, section 994(a) does not allocate taxable income; instead, section 994(a) provides the basis for determining taxable income or, in other words, establishes the taxable income of the related supplier and the DISC from the export transaction. ADM claims that the government cannot and does not dispute the fact that the related supplier can have negative taxable income under the 4 percent method. If the taxable income is a negative amount, the unambiguous 4 percent method does not allow the Secretary to come in and change the result. In addition, ADM contends that

the Internal Revenue Code sections dealing with deductions cannot support the no-loss rule. *See* Plaintiff's Second Memo at 8–9. (docket # 23)

Cases discussing the inter-company pricing rules in section 994(a) refer to them as allocating profits, *Gehl,* 795 F.2d at 1327, as establishing a "deemed" transfer price used to calculate income, *Dresser,* 911 F.2d at 1131, and as allocating income. Even assuming that the purpose of the three methods in section 994(a) is to allocate income, the government's argument does not support the addition of a restriction to an unambiguous statutory section.

IT IS THEREFORE ORDERED that the plaintiffs' motion for partial summary judgment is GRANTED; the defendant's motion for partial summary judgment is DENIED.

IT IS FURTHER ORDERED that the court will hold a status hearing in this case by telephone conference call on October 20, 1992, at 10:30 a.m.